SPADRA CREEK COAL COMPANY *v.* EUREKA ANTHRACITE COAL COMPANY.

Opinion delivered June 17, 1912.

1.  PLEADING—LOST PLEADING—SUBSTITUTION.—The substitution of copies of pleadings for lost originals, without complying with Kirby's Digest, sections 6504, 6506, 6508, providing for substitution on motion after notice, was not error, in the absence of any contention that the substituted pleadings were incorrect or that appellant was prejudiced by their filing. (Page 363.)

2.  MINES AND MINERALS—FLOODING OF MINE—LIABILITY.—The owner of a mine situated on a higher level may permit the water to flow where it naturally will in the course of ordinary mining, and is not bound to protect a mine owner upon a lower level therefrom, and if an injury results from the natural flow from the upper to the lower mine no liability results; but if he conducts into the lower mine water which would not otherwise go there or causes water to go there at different times or in quantities greater than it otherwise would, he is liable for the resulting damages. (Page 363.)

3.  SAME—FLOODING OF MINE—LIABILITY.—The owner of a mine who knew of the existence of two abandoned mines lying adjacent to his, and who drilled into the smaller mine, without ascertaining that the two abandoned mines were connected, and thus permitted a large quantity of water therein to flood an adjacent mine in operation, without taking any steps to prevent same and without notifying the owner thereof that he might protect himself, is guilty of negligence. (Page 366.)

4.  SAME—DAMAGES TO ADJOINING MINE.—In an action for damages from the flow of water into plaintiff's mine, caused by defendant's negligence, where it appeared that the mine was closed for twenty days,

that its output was from 175 to 200 tons per day on which the profit was $1.65 per ton, that it incurred an expense of from $25 to $30 per day during such time, and that machinery worth $400 was destroyed, a verdict of $1,000 was not excessive. (Page 367.)

Appeal from Johnson Circuit Court; *Hugh Basham,* Judge; affirmed.

### STATEMENT BY THE COURT.

This suit is for damages alleged to have been caused appellee by the careless and negligent flooding of its coal mine by appellant.

The companies own and operate adjoining coal mines in Johnson County, the Spadra Creek Coal Company's mine being north of the Eureka and on a higher level. The coal in the two mines is of the same vein, and dips from south to north, the coal in appellee's mine being lower than that in appellant's.

There was an underground opening between the two mines, appellee having at one time in mining its coal crossed, by mistake, the dividing line and removed some coal on appellant's side thereof. Appellant mined its coal up to the line, and they were thereby connected with an opening 100 feet or more in width. The water accumulating in the Spadra Creek mine flows naturally into the Eureka. There were old mine workings a little to the southeast of the Spadra Creek Company's mine on a higher level, the Red Devil and the Great Western, the latter being upon appellant's property and nearer the Spadra Creek mine than the Red Devil on the land of a different owner. These old mines had been abandoned for some years, and it was generally understood that they were filled with water and the Spadra Creek people also understood that the underground chamber of the Great Western was of five to eight acres in extent, and did not know that there was any communication, or opening, between it and the Red Devil. Its manager did know that there was water in the Great Western, and had at one time attempted to procure a pump and boiler from another company, with which to take the water out of same from the shaft. They also knew the old works were not surveyed and mapped when they started an entry in the direction of their old mine. The State mine

inspector directed that they should drill ahead of the work at least twenty feet, in order to protect the miners from a sudden breaking through into the old mine. "We drove one hole ahead and two flanking holes so we would not blow through there accidentally and let the water into our mine. All entries in that direction have been driven in that way for a year to safeguard our miners. Water began to seep through. We had the mine surveyed again and started three entries for the old air shaft, supposing one of them would bring us about the last point in the old mine. We abandoned all work going south where our coal lay, and began south of the three entries where we meant to connect with the old mine. Our first east of the three entries struck the old workings November 22, 1910." This was the statement relative to the connection made with the old mine and the underground lake made by the manager of appellant, who also said that he had no reason to believe the water therein would be deep, and had no knowledge of its connection with the Red Devil and the forty acres of water therein, east of the property. He did not know of the connection until the water began to flow into appellant's mine and to fall in the Red Devil. No extra preparations were made by appellant company to take care of more than the usual flow of water in the operation of the mine in anticipation of the connection with the old mine, nor did it give appellee company any notice that it had come so near to the old mine that the water was seeping through, or any information that it had drilled into the water in the old mine at all. Appellee first had information of the release of the water when its superintendent noticed the flooding of its mine and began to investigate the cause thereof. After the water began flowing into their mine in greater quantities than they could take care of, they made ditches carrying it into appellee's mine. The manager said: "There was a natural drainage through our mine into the Eureka, and when we could not care for the water it flowed onto them. There were three or four openings of about 100 feet between us, made by the Eureka encroaching on our land. Every effort was made to try to take care of the water after we struck it. We were in our land and coal when we struck the Great Western. I understood there was about forty acres of the Red Devil, but only from five to eight acres

of the Great Western, and did not know that there was any connection between the old mines. We knew that unless the water was prevented it would flow into the Eureka, but we expected to prevent it and would have done so but the water ate up the pipes and pump. Appellant's superintendent stated: "We were able to take care of only about 25 per cent. of the water, and about 75 per cent. of it went into the Eureka. I made the little ditches to throw the water into their mine to protect our air shaft for the time being. At the time we broke through, we were not prepared to protect the Eureka against 75 per cent. of the water. I think we could have handled the water if it had not caused our pumps to play out. I refused once to let the Eureka people go into our mine after we struck the water, and was doing all I could to handle it."

Appellee's forces fought the flooding waters for twenty days at great expense, three shifts of men being kept at work eight hours each per day, at an expense of $25 or $30 daily, and handled the water with the pumps until they were corroded, rusted and destroyed by the acids in the water and its boilers greatly injured, finally building a 250-gallon water box, fastening it to the cage and hoisting it out with that. The mine was shut down for twenty days on account of the flooding. At the time its capacity was 175 to 200 tons of coal per day, all of which was being disposed of. It was mined at a cost of about $2.20 and of the value of $3.85. Two pumps of the value of $400 were destroyed in pumping out the water.

The court instructed the jury, which returned a verdict in appellee's favor for $1,000, and from this judgment appellant appealed.

The papers in the case, the complaint and the answer, were lost or misplaced, and the court permitted appellee to substitute copies thereof, the record reciting: "It being shown to the court that the complaint, answer and other papers heretofore filed in this cause are lost and can not be found, leave is by the court given to the plaintiff to file substituted papers in this cause in lieu of the original, which is accordingly done."

Appellant moved the court to strike the substituted complaint and the substituted answer from the files, because they were filed without notice to it and because the proper

steps were not taken, as required by statute, to entitle **appellee** to file same, etc. This motion was overruled, and exceptions saved.

*Atkinson & Jacobs,* for appellant.

1. Defendant's motion to strike from the files the substituted pleadings, because filed without notice, should have been granted. Kirby's Dig., § 6506, was not followed, but summary action taken without proof of loss of the records. 19 A. & Eng. Enc. L. par. C. Evidence (1); *Ib.* 563; 34 Cy. 608, 610.

2. Plaintiff sued as a corporation, which fact was put in issue. No evidence was introduced, and a peremptory instruction for defendant should have been given. .

*Cravens & Covington* and *Patterson & Ragon,* for appellee.

1. The papers were lost and properly substituted. No objections were made, though appellant's attorneys were present.

2. A denial of corporate existence upon information and belief is not sufficient to put in issue a positive allegation of incorporation. 5 A. & E. Enc. Pl. & Pr. 87; 93 N. Y. 474; 21 S. C. 27.

3. The duty rests on one who brings or stores upon his premises dangerous agencies from the escape of which injury is likely to follow to prevent such escape. 1 Exch. 265; 7 *Id.* 305; 108 Mass. 261; 11 Am. Rep. 352; 31 L. J. Q. B. 286; 10 Am. Rep. 184; 32 L. R. A. 736.

KIRBY, J., (after stating the facts). It is contended, first, that the court erred in allowing copies of the pleadings in the case to be substituted for the lost originals without requiring a compliance with the statute relating thereto. Sections 6504-6-8, Kirby's Digest. Appellant makes no contention that the substituted papers were not correct copies, nor does it show any prejudice or injury resulting to it from the court's action in permitting them be to filed, and the court committed no error in reinstating them of record. *Fort Smith Automobile & Supply Co.* v. *Nedry,* 100 Ark. 485.

It is insisted by appellant that it had the right to operate its mine; and if, in the operation thereof, it was flooded with an unusual quantity of water that would not have flowed

into appellee's mine but for the opening between the two, wrongfully made by appellee in crossing the dividing line in its mining operations in the first instance, it can not be held liable for the resultant damages.

The court instructed the jury that the making of such an opening or connection between the two mines in that way would not justify defendant in causing a greater amount of water to flow into the mine of appellee than such as would result ordinarily from the conduct of the mining operations of appellant, and that if the appellant knew of the existence and location of the underground body of water, or by the exercise of ordinary care should have known that its action in releasing or discharging the same into its own mine would result in causing greater quantities of water to flow into the mine of appellee to the damage of appellee, and that appellant wilfully, carelessly or negligently discharged or released great quantities of water into its own mine, and that it flowed in great quantities into the mine of the appellee, the appellee could recover for the damages caused thereby; that it was the duty of appellant to exercise ordinary care in the use of its property in order to avoid injury to the property of appellee; that if it carelessly, negligently or wilfully discharged the water from the abandoned mine south of its workings into its own mine, and the same flowed through it in great quantities into the mine of appellee to its damage, and if appellant knew at the time it released the water into its own mine, or could have known by the exercise of ordinary care, that same would flow into the mine of appellee and injure and damage it, it would be liable therefor.

It also told the jury that, if appellant acted in the matter in dispute as a reasonably prudent person would have done in his own affairs, it was not liable, and that, in order for appellee to recover, it must show that appellant's work in connection with the body of water underground was done carelessly, negligently and in disregard of appellee's rights.

The authorities seem to agree that the owner of a mine on a higher level may permit the water to flow where it naturally will in the course of ordinary mining, and is not bound to protect the mine owner upon a lower level from such water, each mine owner being required to make for himself proper

provisions for drainage and against flooding so far only as to water coming into the mine in a natural way and in the ordinary course of mining. If an injury is caused from the natural flow of the water from the higher level to the lower mine, no liability results; but, if from the act of the party, he is liable for it. The Law of Mines and Mining in the U. S., Barringer & Adams, 630;  2 Snyder on Mines, § § 1050-1; 2 Lindley on Mines, 807.

"Where, however, the owner of one mine conducts into the adjoining mine water which otherwise would not go there, or causes water to go there at different times, or in quantities greater than it otherwise would, he is liable for the damage resulting." Law of Mines and Mining in U. S., *supra.*

"One miner may not turn or pump his water into his neighbor's mine; but he is not liable if it goes there by seepage or gravitation if induced or accelerated by no act of his. * * * A practical application of the maxim, "so use your own as not to injure others," controls in such cases. 2 Snyder on Mines, § § 1051, 1054.

One of the text writers states the rule deducible from the authorities as follows: "It is the duty of the highest proprietor, whether his vein be the one which continues on into his neighbor's or whether it be an upper stratum having a communication into a lower one, to take all reasonable care of his debris and his water; but he is not carried beyond the rule of ordinary care, nor made responsible for consequences not flowing from negligence or wilfulness, if he operates his mine in a careful or skilful manner, and if a loss occurs therefrom it is *damnum absque injuria.* * * * But the owner of the upper mine can not suffer the flow of his gangway to run down upon the lower mine, when by reasonable diligence he can prevent it. And where there are two mining operations, one owner working on the upper level and one on the lower level of the same vein, which means farther down on its dip, the owner of the upper level, operating in the most approved method and with care, is not required to control the natural flow of the water downward; that is, such water as may percolate through fissures or otherwise, and which he can not control by the exercise of reasonable care and prudence." Snyder on Mines, § 1058.

In England, an extreme or stricter rule of liability was laid down in the case of *Fletcher* v. *Rylands*, L. R. 1 Exch. 265, holding in effect that whenever a person brings or keeps upon his land anything likely to do mischief, if it escapes, whether beasts, water, filth or stenches, he does so at his peril, being liable for all damages ensuing to his neighbor, if he fails to keep it, water especially, properly on his own property; but later modified to some extent in *Fletcher* v. *Smith*, 2 L. R. App. Cases, 781.

This case, however, was not tried upon the theory of liability for a dangerous agency, water, allowed to accumulate upon appellant's premises and escape therefrom, causing injury to the adjoining owner, appellee, but upon the theory of negligence of appellant in permitting, or causing, great quantities of water to escape and be discharged into its own mine, knowing at the time that it would flood the mine of appellee unless prevented and without making any preparations to prevent it so doing.

Appellant knew of the existence of the old mines, that they were near together, one of about forty acres in extent, the smaller of from five to eight acres upon its land, that both had been long abandoned, and that the Great Western was filled with water. It made no effort to ascertain whether there was any connection between the old mines, although it knew there was no map of the workings, before drilling into the Great Western and releasing the large quantity of water, known to be therein, into its mine, although it knew it would flood appellee's mine, if not prevented by it. It gave appellee no notice, after the water began to seep into the mine, and before it was released by it, that they were about to release the water, that appellee might take such precautions as it deemed necessary for its protection, its only excuse being that it expected to be able to take care of the water in its old mine, and did not know of its connection with the other old mine, and that all the water therein would be discharged as well.

The exercise of ordinary care would have required that it make reasonable effort to ascertain the quantity of water that would be discharged by drilling into the old mine and the kind of water, if it was dangerous to and destructive of machinery, with which it expected to pump it out, as well

as proper preparation to take care of the flow and prevent injury to the adjoining proprietor, and also that it should have given notice to appellee of its proximity to the underground body of water and of its intention to release same, that it could have had an opportunity to protect itself. Having failed to do any of these things, the jury were warranted in finding it negligent and holding it liable for the injury.

The mine was closed for twenty days, its output at the time being from 175 to 200 tons of coal per day, produced at a cost of $2.20 per ton and of the value of $3.85, when mined.

Appellee was at an expense of from $25 to $30 per day for twenty days, in attempting to remove the water from its mine, and its pumps of the value of $400 were destroyed and the boilers and engines of its mining machinery badly damaged by the corroding acids of the water. Under the circumstances, we do not regard the damages of $1,000 assessed by the jury as excessive.

2. If the allegations of incorporation of appellee can be regarded as put in issue by the answer that appellant had not sufficient knowledge and information to form a belief about whether it was a corporation, we think there was sufficient evidence to show that it was incorporated.

Finding no prejudicial error in the record, the judgment is affirmed.