[Civ. No. 12409. First Dist., Div. One. Jan. 26, 1944.]

EMPIRE STAR MINES COMPANY, LIMITED (a Corporation), Respondent, v. COOLEY BUTLER et al., Appellants.

468

474

Pierce Butler, Jr., G. A. Bisbee, H. Ward Sheldon and Graham W. Talbott for Appellants.

Robert M. Searls, William E. Colby and Frank G. Finnegan for Respondent.

PETERS, P. J.—Plaintiff and defendant Cooley Butler each operate gold mines in the Grass Valley mining district of Nevada County. Plaintiff instituted this action against Cooley Butler, Wallace Butler and Fred Kalenborn for injunctive relief and damages. The last two named persons were joined as defendants as employees of Cooley Butler. The action was dismissed as to Fred Kalenborn. The theory of the complaint was that defendants had drilled holes from their mine through which water was artificially and wrongfully introduced into that portion of the workings of plaintiff's mine which is located below the workings of defendants. For this water trespass plaintiff sought damages and to enjoin any future trespasses. Plaintiff also sought to enjoin defendants from continuing to sink a designated winze from their mine into the mine of plaintiff. The trial court awarded plaintiff injunctive relief, in terms that will hereafter be set forth in detail, and damages of $2,531.34. From this judgment defendants Cooley Butler and Wallace Butler appeal.

Inasmuch as the major problems involved on this appeal are dependent upon vein ownership, each party claiming title to that portion of the vein into which the drill holes empty, and since defendant Cooley Butler is the only defendant to claim ownership, references hereafter to "defend-

ant'' in the singular are to Cooley Butler. The other defendant and appellant, Wallace Butler, joins in Cooley Butler's contentions insofar as they are relative to his liability.

*General Facts and Contentions of the Parties.*

The vein owned by plaintiff is known as the Pennsylvania vein, while that owned by defendant is designated as the Dromedary vein. Some 1200 feet vertically below the surface of the ground these two veins come together. The line of contact of the two veins is referred to as the rake of encounter. Below the rake of encounter are located certain workings of plaintiff into which the drain holes above mentioned empty. Defendant contends that these workings of plaintiff are located on a continuation of the Dromedary vein owned by him, and that plaintiff's workings thereon are a trespass. The plaintiff contends, and the trial court found (Cl. Trans. p. 2, line 11), that where the veins come together there is a junction of the Dromedary and Pennsylvania veins; that thereafter there is but one vein; and that title to this vein is in plaintiff under the terms of an agreement made in 1915 between plaintiff's predecessor in interest and defendant's predecessors. If this theory is correct, inasmuch as the drill holes penetrate workings upon the vein below the rake of encounter, defendants were guilty of a trespass in drilling into these workings.

In defendant's analysis there is an intersection of the defendant's Dromedary vein and plaintiff's Pennsylvania vein above where the drill holes penetrate, with each vein continuing on beyond the intersection as a separate vein. Under the agreement of 1915, if there is an intersection of veins, each owner is entitled to follow his vein beyond the intersection; if there is a junction, the single vein below the junction is the property of plaintiff. It is defendant's position that the drill holes penetrate workings which, although made by plaintiff, are in fact upon the downward extension of defendant's Dromedary vein beyond its intersection with the plaintiff's vein. The fourth member of the intersection is claimed to be the Wiggly vein, which, in defendant's analysis, is the downward extension of the plaintiff's vein. It is plaintiff's position, and the trial court found, that the Wiggly vein is a minor, insignificant down dipping branch which departs from the single vein formed by the union of

the Pennsylvania and Dromedary veins. The vein into which the drill holes penetrate is referred to by defendant as the disputed vein, and sometimes will be so designated herein. Defendants' briefs refer to the plaintiff's vein above its meeting with defendant's Dromedary vein as the Penn-yellow vein because of the fact that in a diagram included in the briefs the line depicting a cross-section of that vein is colored yellow.

The question as to whether the Dromedary and Pennsylvania veins intersect, each continuing beyond the intersection as separate veins, or whether they join and become one vein, is the major factual question in the case. On that question depends the ownership of the vein where the drill holes penetrate. The court has found that there was a junction, with the result that the vein below the junction was adjudicated to be the property of the plaintiff under the contract of 1915. The defendant's contention is that the evidence as a matter of law shows an intersection rather than a junction. To succeed in this contention defendants have the burden of showing that the court's finding of junction is without any substantial support whatsoever in the record. It is, of course, as defendant is well aware, not enough that the trial court on the evidence before it could have decided for defendant.

Defendants make the further contention that even though there is a junction of the Pennsylvania and Dromedary veins which continue downward as a single vein, such vein has a subsurface apex at the rake of encounter, which apex is so located that the vein below the junction is the property of defendant under the agreement of 1915.

The defendant's mine upon the Dromedary vein is known as the Golden Center Mine. The court found that in 1936 the defendants drilled a hole from the 1100 level of their Golden Center Mine which penetrated workings of plaintiff on the disputed vein below. The defendants then laid pipes along the 1100 level, into which they conducted water from their mine, and by means of a pump artificially forced water into the dammed up area surrounding the top of the drill hole, and thence down the drill hole into plaintiff's workings on the disputed vein. The plaintiff had acquired the Pennsylvania mine property in 1929. These Pennsylvania workings on the disputed vein had been allowed to fill with water by plaintiff's predecessor before plaintiff acquired the prop-

erty in 1929, with the result, the court found, that plaintiff did not make discovery that water was being introduced through defendant's drill hole until December, 1939, when it was informed of the fact by one of its employees who had formerly worked for defendant. The plaintiff immediately plugged up the hole. In February, 1940, plaintiff unwatered its own workings. The court found that, when the first hole was plugged, defendants commenced artificially to introduce water into plaintiff's workings through a second hole, drilled in 1939, and when plaintiff plugged that hole, defendants sent the water down a third hole, which they had also drilled in 1939.

The court further found that the defendants' agents and employees knew, or reasonably should have known, that the drill holes had penetrated lower levels of plaintiff's mine, and that the water from the Golden Center Mine that was thereafter wrongfully, wilfully and intentionally diverted by artificial means into plaintiff's mine put plaintiff to the expense of pumping out such water, to its damage in the amount of $2,531.34, as computed by representatives of both parties. Defendants do not object to the award of damages, since they concede that, regardless of the ownership of the disputed vein, the water ultimately passed into workings which unquestionably are on plaintiff's vein. (Op. Br., p. 311.)

In addition to the award of damages, the judgment also contained an injunctive provision restraining defendants "from introducing or causing to flow through said drill holes, or any other drill holes similarly driven, or through any artificial conduits, any water from the Golden Center mine so that it will escape through artificial means into the Pennsylvania mine." (Cl. Tr. p. 87.)

By the complaint plaintiff also sought injunctive relief as to a winze which defendant had constructed on its Dromedary vein from its 1650 level to its 1800 level, and which, if continued, would break into the workings of plaintiff. (It has been stated heretofore that the workings particularly involved in this action are located about 1200 feet vertically below ground. The mine levels referred to in this opinion are reached by workings descending into the earth at an angle, rather than vertically, which accounts for the levels being indicated by larger figures than 1200.) This winze is in close proximity to the drill holes through which the

water was introduced into plaintiff's mine. Plaintiff alleged that the sounds of blasting were becoming increasingly audible in plaintiff's mine and that if defendants caused the winze to break into plaintiff's workings there was grave danger that serious injury would be caused plaintiff's workmen; that the roof and supporting timbers in plaintiff's workings would be injured, and that additional floods of water would be permitted to flow into plaintiff's mine through said workings. The findings recite that the court had granted an injunction pendente lite restraining defendants from extending the winze "so as to break into and jeopardize" any of the workings of the Pennsylvania mine. (Cl. Tr., p. 78.) The winze is referred to in the briefs as the "enjoined winze."

By the injunctive provisions of the decree here appealed from it is provided that whenever a close approach of the workings of the two mines is indicated by sounds of blasting or otherwise, maps of the workings in the vicinity shall be exchanged. If after the exchange of maps and further consultation any breaking into or injury to plaintiff's workings seems reasonably imminent, defendants are enjoined from further pursuing their vein in the enjoined winze or at any other point where it may endanger life or property of plaintiff. The decree further provides that "if, in order to avoid breaking into and injuring plaintiff's workings in violation of the court's findings and judgment herein, defendant Cooley Butler shall find it necessary to leave intact any protective pillar of rock containing ore which he deems valuable, he shall notify plaintiff of this fact and request a joint appraisal of said ore by representatives to be designated by him and representatives to be designated by plaintiff." If the representatives fail to agree as to value, the question shall be referred to the court, which retains jurisdiction to enforce the decree. If plaintiff fails to pay the value so ascertained within ten days, or if plaintiff at any time notifies defendant that it does not object, defendant may proceed to mine the protective pillar. (Cl. Tr., pp. 88 and 89.) The decree recites that "equitable considerations and the fact that plaintiff's workings in this vicinity have been constructed and were in existence long prior to the approach thereto of defendants' workings" lead to the decree in this form. (Cl. Tr., p. 88.)

Defendant argues that even though it is held, contrary to his contention, that there is a junction of veins and that, therefore, the plaintiff owns the disputed vein, nevertheless the above injunctive provisions are not called for by the exigencies of the situation. The decree forbids defendant to mine his own Dromedary vein up to its junction with plaintiff's vein by requiring him to leave a protective barrier, and this, in defendant's view, constitutes an exercise of eminent domain in favor of a private corporation for its private purpose.

*Interpretation of the phrase "parts of veins" in the 1915 Agreement.*

Reference was made above to defendant's contention that even though there is a junction of the Dromedary with the Pennsylvania vein, nevertheless, under the agreement of 1915, made by the predecessors in interest of the parties to the present suit, the defendant is the owner of the vein below such junction.

The shaft of the plaintiff's Pennsylvania mine is located to the south and east of the shaft of defendant's Golden Center mine. The plaintiff's shaft is located outside the boundaries of the townsite of the city of Grass Valley, defendant's shaft within those boundaries. Development of the Pennsylvania mine in the area of the Pennsylvania shaft commenced more than seventy years before the present action. The Golden Center mine is of much later development. Both mines contain extensive workings.

In the case of federal mining patents the locator acquires what is known as an extralateral right to follow a vein which apexes on his location beyond his own surface side lines beneath other lands. (Rev. Stats., § 2322.) The federal law further provides: "Where two or more veins intersect or cross each other, priority of title shall govern, and such prior location shall be entitled to all ore or mineral contained within the space of intersection; but the subsequent location shall have the right of way through the space of intersection for the purpose of convenient working of the mine. And where two or more veins unite, the oldest or prior location shall take the vein below the point of union, including all the space of intersection." (Rev. Stats., § 2336.)

The extralateral right above described does not exist in townsite lots which are held under non-mineral townsite pat-

ents. As to such townsite lots, extralateral rights do not apply even though the original location of the vein is outside the townsite. As to townsite lots, title to the surface carries title to fixed mineral deposits beneath. The workings upon the disputed vein, into which the defendant's drill holes penetrate, are within the Grass Valley townsite, being beneath lots 6 and 7, block 18, of the townsite. In 1915, when plaintiff's and defendant's predecessors entered into the agreement upon which their rights depend in the present suit, plaintiff's predecessor owned mineral rights in a number of lots in the Grass Valley townsite, including lots 6 and 7, block 18, and defendant's predecessors owned such rights in other lots under grants from the surface owners. The divided ownership is described in plaintiff's brief as a "checkerboard," which made economical mining operations impractical. It was to try to settle the problems growing out of this "checkerboard" ownership that the 1915 agreement was entered into.

The agreement recites that the parties each own land and mineral rights situated in the townsite within an area bounded on the north by the center line of Main and West Main Streets, on the east by the center line of Auburn Street, and on the south by the south boundary of the townsite as delineated on an official map of 1872; that one of the parties of the second part (one of defendant's predecessors) also owns properties west of the western boundary of the townsite; that it is contemplated that each party may acquire hereafter other property and mineral rights within the above described boundaries of the townsite and also property outside the townsite and west of the west boundary thereof. (Agreement is printed, Supp. to App. Op. Brief, p. 1, et seq.)

It is then provided that the purpose of the agreement is to adjust amicably and finally controversies which have arisen between the parties with regard to the extent of their respective rights within the boundaries described. By paragraph first of the body of the agreement the predecessor of plaintiff grants and conveys to defendant's predecessors "all veins and parts of veins which have their tops or apices within the areas bounded as follows: on the North by the center line of West Main and Main Streets, on the East by the center line of Auburn Street, and on the South by the

482

South line of the Grass Valley Townsite," as shown on the official map, and "all veins which have their tops or apices west of the west boundary of said Townsite, and which lie beyond the center line of West Main Street extended indefinitely in its own direction northwesterly, and the south boundary of said Townsite extended indefinitely westerly, with the right to follow said veins on their downward courses indefinitely westwardly between said North and South boundaries, and said boundaries extended in their own directions westerly and eastwardly to the intersection of said veins with a vertical plane drawn through the center line of Auburn Street, and northerly to a vertical plane drawn through said center line of West Main and Main Streets, and southerly to a vertical plane drawn through the south line of said Grass Valley Townsite, extended in their own directions westerly." (Supp. to App. Op. Brief, p. 3.) It is to be noted that the area within which veins must apex to be the property of the defendant's predecessors is the area described in the preamble of the agreement. The apex of the Dromedary vein, which extends on strike for a considerable distance in a general north-south direction, lies, in part, within the bounded area. With any portion of such apex that may extend outside the bounded area we are not here concerned.

The defendant's predecessors, in turn, conveyed to plaintiff's predecessor by paragraph second "all veins and parts of veins which have their tops or apices outside" the area bounded as described above, "with the right to follow said veins on their downward courses indefinitely." (Supp. to App. Op. Brief, p. 4.) It is to be noted that plaintiff's predecessor is given the right to follow veins apexing *without* the area indefinitely on their downward course beneath the bounded area, but that it is only in a westerly direction that defendant's predecessors were to have the right to follow indefinitely to full depth veins apexing *within* the area. The apex of the Pennsylvania lies outside the bounded area.

It was also provided that properties and rights which the parties might thereafter acquire within the defined areas should be subject to the agreement.

Paragraph third of the agreement is as follows: "Should any of the veins hereinbefore described and conveyed to said parties of the second part [defendant's predecessors] unite or form a junction on their downward course with any vein or veins hereinbefore described and conveyed to the party

of the first part [plaintiff's predecessor], the party of the first part shall be deemed to be the owner of the vein in its further downward extension below the line of union or juncture. If the veins, or any of them, belonging to the party of the first part intersect or cross a vein or veins of the parties of the second part, the ore at the space of intersection shall belong to the party of the first part. Below such intersections each party shall be entitled to pursue and mine its or their own vein.'' (Supp. to App. Op. Brief, p. 6.)

The court found that in framing the above paragraph the parties had in mind § 2336, Revised Statutes, above quoted. (Cl. Tr., p. 65.) The parties admit that the words ''unite,'' ''union,'' ''intersect,'' ''cross'' and ''space of intersection'' were used in the agreement with the same meaning as those terms have in the statute.

The obvious purpose of the agreement was to provide by contract for a form of extralateral right in the townsite lots somewhat similar to what would exist under a federal mining patent. This was done to overcome the difficulties of the ''checkerboard'' ownership above described.

It will be noted that both the federal statute and paragraph third of the 1915 agreement provide for two situations, first, for an intersection or crossing of veins, and secondly for a union or junction of veins where they form a single vein below the rake of encounter. The contract provides that each party shall be entitled to pursue his vein below an intersection, and this is also the clear meaning of the statute. Defendant's main contention, hereafter considered, is that there is an intersection within the meaning of the contract and the statute, with the result that the disputed vein is the downward continuation of the Dromedary vein beyond the intersection and is the property of defendant, and that the Wiggly vein, the fourth member of the intersection, is the downward continuation of the Pennsylvania vein and the property of plaintiff. But, in addition, and this is the point now under discussion, defendant makes an alternative inconsistent contention that the situation is something other than an intersection or junction as those terms are used in paragraph third of the contract; that even though the Pennsylvania and Dromedary veins unite to form a single vein, that vein thereafter divides into the disputed and Wiggly veins, which are ''parts'' of the single vein

formed by the union, and such parts have their apices at the line where the vein divides. Since such line lies within the area bounded on the north by Main Street, on the east by Auburn Street and on the south by the south line of Grass Valley townsite, defendant argues that the Wiggly vein and the disputed vein are both its property under paragraph first of the contract of 1915. By that paragraph plaintiff's predecessor conveys to defendant's predecessors "all veins and parts of veins which have their tops or apices" within the bounded area.

Defendant concedes that, if there is a clear-cut intersection, each party is entitled to pursue his own vein below the intersection under paragraph third. But, says defendant, where the identification as junction or intersection is "obscure" (Op. Br., p. 56), or where the veins meet and follow a common course along "a space of intersection for some distance to another and downward divergence" (Op. Br., p. 39), then paragraph third does not control, but the ownership of the down dipping forks is governed by the provision that "all veins and parts of veins" which have their apices within the bounded area are conveyed to defendant's predecessor. If this construction be correct, it would mean that every vein, in addition to its normal apex, might have one or more subsurface apices at every point where it met another vein.

If, as defendant contends in other portions of his argument (and as we are prepared to hold), there may be an intersection notwithstanding one vein cannot be visibly traced through another, then, under paragraph third, each party is entitled to his vein below the intersection. If, on the other hand, on the facts of the particular case, there is a union or junction, rather than an intersection, then, in our view, ownership of the single vein below the junction carries with it ownership of the forks into which the vein may later divide.

In the absence of the phrase "parts of veins" in paragraph first there would be no ground for contending that ownership of the single vein below a union does not, under paragraph third, carry with it ownership of the forks into which the vein may divide. Furthermore, the single vein formed by a union within the bounded area, although without a branch, equally with the forks below a union, would be a part of vein with a subsurface apex, as would both lower members where there is without doubt an intersection.

Yet in these situations ownership under the contract is clearly not made to depend on location of a lower subsurface apex.

█ It is plain that under § 2336, Revised Statutes, ownership of the single vein below a union embraces ownership of down dipping forks into which the vein splits. The court found that the parties had the statute in mind in drafting the contract. It is true that the statute does not use the phrase ''parts of veins'' as does the contract, but we are of the view that the phrase was not used with an intent to alter the statutory scheme in this particular. Defendant cites no statute nor any decision involving a contract where ownership is made to depend on location of a lower apex rather than the apex nearest the surface. We are of the opinion that, had the parties to the contract of 1915 intended such an unusual result so contrary to the general mining law, they would have so provided expressly in paragraph third, rather than have left the matter to a strained implication from the phrase ''parts of veins.''

It would seem that the inclusion of this phrase is of little significance. There is no difference in the meaning of the contract whether these words are included or omitted. The phrase is probably referable to the fact that the parties held divided ownership of mineral rights in the bounded area west of Auburn Street, with the result that each might own parts of a vein. Obviously, plaintiff's predecessor intended to convey to defendant's predecessors only such parts as plaintiff's predecessor owned. Or the parties may have had in mind a vein extending longitudinally along its strike beyond the bounded area, in which event only the part lying within such bounds extended vertically beneath the surface was conveyed to defendant. Then again the parties may have included the phrase with the thought that up dipping forks with separate apices under the agreement might be parts of veins in the sense that they were branches of other stronger forks.

The interpretation for which defendant contends would not only be contrary to the general mining law, would not only lead to confusion and endless disputes, but would also lead to uneconomical mining. If defendant be correct, all downward forks with a subsurface apex west of Auburn Street would belong to defendant. In the event there was no nearby upward fork, with apex west of Auburn Street,

the defendant would have no direct approach to the downward fork and could reach it only by cross-cut, that is, by cutting across country rock from vein to vein, rather than by following a vein. Occasionally, cross-cuts are used in mining operations. In fact, the Pennsylvania 2400 level near the shaft was originally reached by cross-cut from the plaintiff's Empire vein. But a construction making cross-cutting the rule, rather than the exception, would be uneconomical and opposed to reason.

For these reasons, we think that defendant's construction of the contract based on the phrase ''parts of veins'' must be rejected. It follows that the ownership of the disputed vein depends on whether there is a junction between the Dromedary and Pennsylvania veins, in which event the vein is the property of plaintiff, or an intersection, in which event it is the downward continuation of defendant's Dromedary vein. The trial court has found that there was a junction, and this finding must be affirmed unless as a matter of law it is without support in the evidence.

*Definition of ''intersection'' and ''junction.''*

The parties disagree as to the definition of the terms ''intersection,'' and ''junction,'' as those terms are used in the 1915 agreement. Defendant contends that the basic finding of the court that there was a ''junction,'' is based upon an erroneous definition given the term ''intersection'' by plaintiff's witnesses. In his memorandum opinion the trial judge stated that he did not base his judgment on plaintiff's definition, but, in the view of defendants, the findings cannot otherwise be sustained.

Plaintiff squarely takes the position that an intersection results only when a vein of one geologic age cuts across a vein of an earlier geologic age, in which event the later intersecting vein may be visibly traced through the earlier one. In this analysis a difference in age of veins is a *sine qua non* to the existence of an intersection, and visible traceability of one vein through the other is a manifestation of the process of formation. Also, in this analysis, the only vein that exists in the area of intersection is the vein of the youngest geologic age, it being the vein that intersects, cuts across, and displaces the older vein where the two veins meet.

Defendant rejects plaintiff's test of different ages, and contends that the criterion is principally one of position

and appearance. Position is determined by strike and dip. ''Dip'' is broadly defined as the downward course of a vein, the direction or inclination toward the depth, while ''strike,'' at right angles to dip, is used to designate the longitudinal or horizontal course of a vein. (1 Lindley on Mines, p. 718, § 317.) Defendants concede (Cl. Br., p. 12), as they must, that, if plaintiff's test of intersection be accepted as the correct one, then the finding that there was a junction and not an intersection is supported by substantial evidence. On the other hand, if the test proposed by plaintiff is incorrect, and that proposed by defendants is correct, then the question is presented as to whether, using defendants' standards, the finding is supported. In the memorandum opinion of the trial court reference is made to the opposing definitions, and, it is stated: ''. . . the court views the question as one not entirely controlled by legal definition but also a question of fact to be determined from the particular facts and circumstances as shown by the evidence in the case.'' In the findings the trial court describes the relative positions of the respective veins, and describes in detail the differences in physical appearances between the Dromedary and the Pennsylvania veins. It is upon these findings that the trial court determined that there was a junction and not an intersection. Thus, it was the theory of the trial court that, applying the tests proposed by defendants, there was a junction and not an intersection. Plaintiff urges that the basic finding that there was a junction is supported by either of two theories. It first urges that, independent of the findings relating to the position and appearance of the veins, if its definition of ''intersection'' be accepted, there can be no doubt, and defendants admit, that there is substantial evidence that the two veins are of the same geologic age, and that one cannot be traced through the other. Therefore, it urges, the finding that there was a junction, is supported. On the other hand, if its definition of ''intersection'' be found to be incorrect, and, if the tests offered by defendants be applied as the proper criterion, it urges that the findings as to the relative positions and appearances of the veins are supported, and that these findings support the finding of junction. In view of this twofold argument in support of the ultimate finding under attack, logical considerations suggest that we should first determine the proper definition

of the term "intersection," because, only if the definition proposed by plaintiff be found to be incorrect, need there be considered the sufficiency of the evidence to support the findings relative to the position and appearance of the veins.

 We are convinced that the definition proposed by plaintiff must be rejected, and that the trial court properly applied the tests proposed by defendants.

The parties are agreed that the term "intersection" has the same meaning in the agreement of 1915 as it has in § 2336, Revised Statutes. The contract gives to plaintiff rights which, under the statute, go to the prior locator.

Dr. Buwalda, expert witness for plaintiff and head of the department of geology at the California Institute of Technology, testified that his conception coincided with the definition given in the Glossary of the United States Bureau of Mines. That definition is as follows: "Intersecting Veins. A vein or lode which cuts across one of earlier formation." (Tr., pp. 978, 1586.) In elaborating upon that definition the witness testified that in order that there be an intersection there must be a deposition of the materials in the respective veins at different times; that the fracturing and deposition of vein material in the Pennsylvania vein was simultaneous with the fracturing and deposition of vein material in the Dromedary vein; that intersection, as a term in mining law, involves a time relation—a later vein cutting across an earlier one—differing in that respect from the meaning of the term as used in application to streets.

The witness further testified that it was the "possibility of tracing one vein through another, through an older one," which gave "rise to the relation of intersection." (Tr., pp. 984, 925.) In this analysis the tracing through process is evidence of the difference in age of veins, and that one has cut the other. In illustration of his definition, the witness said that if a quartz vein and a galena vein came together at right angles, and the galena could be observed passing through between the edges of the quartz, there would be no doubt that there was an intersection. After the witness had said that the analogy was an unhappy one in that it would not be likely that a quartz vein and a galena vein would form simultaneously, he was asked by defendants' counsel to draw a diagram depicting a junction of a galena vein and a quartz vein at the angles above specified. The witness then prepared a diagram, in form a right angle cross, introduced

as defendants' Exhibit L (Tr., p. 930), showing a quartz vein colored yellow and a galena vein colored brown. The central area is colored mottled brown and yellow to show a commingling of veins, with inability to trace either upper member through the central area to a corresponding lower member. The witness testified that under his definition there would not be an intersection even in such a case of definite correlation in position and kind of vein material between the upper and lower members.

The plaintiff's witness Mann also drew a diagram in the form of a right angle cross, depicting veins meeting, which was introduced as defendants' Exhibit E (Tr., p. 452). He testified that unless one vein could be traced through from upper to lower member there would not be an intersection. Other witnesses for plaintiff gave similar definitions.

In the analysis of plaintiff's witnesses traceability of the vein is evidence that a later vein has cut or intersected an earlier vein. The fact that both the Dromedary and Pennsylvania veins are quartz with certain similar characteristics would not preclude there being an intersection within the meaning of plaintiff's witnesses. That is, it would not be necessary that a different material be traced through. The witness Buwalda referred to a "structure" as running through where there is an intersection (Tr., p. 923), and one of plaintiff's other witnesses referred to a tracing through of the gouge from an upper member to a lower member. In plaintiff's brief it is said that some "distinguishing feature" of the younger vein must be traceable through the older one. (Resp. Br., p. 146.)

Defendant contends that subsequent geological developments may affect traceability, thus destroying the evidence of intersection as plaintiff defines the term. Defendant refers to a statement as follows in *Clark-Montana R. Co.* v. *Butte & Superior Copper Co.*, 233 F. 547, 570: "It is obvious, and also admitted, that if the veins cross at any one point, they must cross at all points, *even though so obscurely as to be undiscoverable.* But this is not so of union. Every appearance of union and merger may exist at many places, but if one point of crossing is proven, all evidence of union avails nothing and the veins are proven to cross throughout. *Healing and cementation may destroy evidence of crossing in many places.*" (Italics added.)

Reference is also made to *Clark-Montana Realty Co.* v. *Anaconda Copper Mining Co.*, 20 F.2d 1008, 1014, where the court stated: ''Plaintiffs refer to the sometime appearance of union of veins, when in fact one intersects the other, and recementation by mineralizing solutions conceals the evidences, as of reference in the Elm Orlu Case [*Clark-Montana R. Co.* v. *Butte & Superior Copper Co., supra*].''

The witness Buwalda testified to the Pennsylvania and Dromedary veins being of contemporaneous creation which, in his analysis, precluded an intersection, but whether for this conclusion he relied solely on the fact, as he found it, that one vein could not be traced through the other, or on additional factors, is not plain.

Defendants' witnesses, on the other hand, testified that in determining whether there was a junction of veins they attached no significance to the relative ages of the two veins. The position of defendants is illustrated by the testimony of the witness Tolman (Rep. Tr., p. 1565):

''Q. We have a particular question here: To your mind what is the distinction as the terms are used by geologists and mining men, between the situation where, on the one hand, the vein crosses another and intersects it, and, on the other hand, where a vein joins or unites with another? A. I think the question is one entirely of geometry and identification. Q. Just explain that? A. If one vein crosses another vein, the crossing is proved if the two portions of the first vein are correlated and the two portions of the second vein are correlated beyond each vein. In other words, the correlation is just as simple as the correlation of a street crossing. We know that one street crosses another when we find each street on either side of the other street, beyond the crossing, and it doesn't make any difference at all how the street was developed, whether the grader went down one street and swung around the other. The relative age of the streets makes no difference, nor even whether one street was paved later than the other. The question is a question of crossing, in the minds of miners and in the minds of the common people: Are the two portions of one vein identifiable on each side of the crossing, and likewise are the two portions of the second vein identified as on each side of the crossing? Q. And with that definition, is it necessary that one vein be traceable or discernible throughout the point of meeting in its crossing of the other vein? A. I do not think it is

necessary that the actual penetration of the two structures should be followed and, moreover, I believe in Grass Valley it might be a very, very difficult problem and work that is entirely unnecessary. Q. To that definition, is there necessary any questions of relative times of the fissures in which the veins appear or relative times of the deposits within either vein? A. I do not think that it is necessary to go into the question of relative times and I think that is especially true in regard to the Grass Valley District. Q. Why is that particularly true as respects that district? A. Because in the Grass Valley District, as is well known, we have a long series of events that have fashioned these ore deposits. We first had some fracture that controls the ore solution and controls the deposits or intrusion of the ores. The fissures were opened up and solution under pressure came up these fractures. Then, the ore was deposited, but even under the assumption that the ore came out at a general time it must have reached the different veins by different routes and the ore itself could be scarcely thought to be contemporaneous in different veins. Furthermore, the fracturing continued after the deposits of the ore and all of these features are a part of the vein. The deposition of the vein material itself took place in different stages.''

The question, as we have said, is the sense in which the words ''intersect'' and ''intersection'' are used in § 2336, Revised Statutes, which provision, the court found, the parties had in mind in drafting the contract of 1915. Neither counsel has found decisions which squarely consider whether the time element is necessarily involved in the definition, or, if such element is involved, whether tracing through is essential to show different ages.

To what weight is the definition in the Glossary of the Bureau of Mines entitled? Buwalda testified that he would take the definition there given as the one in current use and as representing the understanding of the mining profession. He also testified that such bulletins as the Glossary are usually made up by one of the senior members of the bureau and then passed around to others in the bureau with a view to getting as precise a definition as possible; that the definitions contained therein represent an agreement among the older men in the bureau; that he had no direct evidence as to the Glossary, but every reason to believe it was thus prepared. Defendant brought out, however, that

the Glossary does not even attempt to define "junction" or "union," as opposed to "intersection."

The definition of the Glossary is an interpretation by an administrative tribunal charged with development and promotion of the mining resources of the country. It does not appear, however, that the bureau in the performance of its duties has had occasion to apply this definition in determining rights among private owners or rights of such owners in relation to the government. Its definition is entitled to consideration, but it is not conclusive.

Although there seems to be no decision squarely considering the meaning of the terms "intersect" and "intersection" as used in § 2336, Revised Statutes, both parties construe judicial remarks as favoring their contentions. Plaintiff again quotes from *Clark-Montana R. Co.* v. *Butte & Superior Copper Co.*, 233 F. 547, as follows (p. 561): "Defendant's witnesses are of the opinion the Rainbow and Jersey Blue *are of the same age and unite,* the latter a strand of the former. Plaintiff's witnesses are of contrary opinion. The latter definitely describe places where the Jersey Blue *crosses* the Rainbow, from observation." (Italics added.) Plaintiff also refers to p. 568 of that opinion where the court stated: ". . . the Jersey Blue is found *cutting* the Rainbow." There is no doubt implicit in these quotations the thought that veins of different age cross, while those of the same age unite, and that such crossing can be observed visibly.

Plaintiff also refers to four quotations from *Clark-Montana Realty Co.* v. *Anaconda Copper Mining Co.*, 20 F.2d 1008, 1010, where the court in discussing the facts and contentions of the parties there involved stated: ". . . at crossing, the Emily vein *penetrates* the Poser vein"; ". . . And in lower levels certain veins of East-West age . . . are intersected by veins of Northwest age"; ". . . plaintiff's theory that the Poser vein is of Steward age . . ."; ". . . intersection affords an infallible test of age."

Plaintiff also places some reliance upon *Consolidated Wyoming Gold Min. Co.* v. *Champion Min. Co.*, 63 F. 540, where the court seemed to imply that there is a union, rather than an intersection, where veins are formed and filled "at the same period of time, by the same force of nature." (p. 545.)

From these isolated phrases and sentences plaintiff draws the implication that intersection is an infallible test of age, and that the term "intersection," in mining law, can only be used in the sense of a later vein cutting across an earlier one.

Defendant cites *Esselstyn* v. *United States Gold Corporation*, 59 Colo. 294 [149 P. 93], and *Butte & B. Min. Co.* v. *Societe Anonyme Des Mines*, 23 Mont. 177 [58 P. 111, 75 Am.St.Rep. 505], as discussing the nature of an intersection without indicating that a tracing through is required.

The text-writers have little to say on the subject. Defendant includes in his briefs diagrams copied from Costigan's Mining Law purporting to illustrate "veins uniting" and "veins crossing." (Op. Br., pp. 40-41; Clos. Br., p. 10; Costigan, Mining Law, pp. 455, 457.) In these illustrations each vein is represented by a single dark line. They show two single lines meeting to illustrate "veins uniting" and two single lines crossing to show "veins crossing." The discussion in connection with the diagrams says nothing of tracing through, or of age. Since the veins are illustrated by single dark lines on these diagrams, rather than by double lines, as on the Mann and Buwalda drawings, it cannot be ascertained from them whether the writers regarded one vein as passing through the other in the sense of being traceable through.

Plaintiff quotes from Le Conte's Elements of Geology, page 248, as follows: "The relative age of veins in the same region is determined in the same way as that of dikes, viz., by the manner in which they intersect each other: the intersecting vein being, of course, younger than the intersected vein." This statement can be construed to mean that if veins do intersect in the sense of a later vein cutting across an earlier one, the vein which is the younger is, as the writer says, of course, the *intersecting* vein, while the older vein is *intersected*, rather than as expressing a view that in the law of mines there cannot be an intersection, as that term is used in the statute, if two veins are of the same age.

It is apparent that there are neither definitive decisions nor convincing analysis by textwriters specializing in mining law on this subject. However, we are not without a guide to the proper meaning of the term. We think that the language and theory of the statute which the parties had in

mind in drafting the contract demonstrates, to a certainty, that a tracing through is not essential to show an intersection. Section 2336, Revised Statutes, may well be quoted again: "Where two or more veins intersect or cross each other, priority of title shall govern, and such prior location shall be entitled to all ore or mineral contained within the space of intersection; but the subsequent location shall have the right of way through the space of intersection for the purpose of the convenient working of the mine. And where two or more veins unite, the oldest or prior location shall take the vein below the point of union, including all the space of intersection." Under plaintiff's definition there must be a visible tracing through of the intersected vein by the later intersecting vein, or, perhaps plaintiff would admit that if that evidence has been obliterated by time, other evidence may be offered that in fact a later vein cut across an earlier one. If either of these tests be applied to the statute, strange results follow. Under the terms of the statute where veins "intersect or cross" the mineral within the space of intersection is given to the prior locator. If an intersection existed within the meaning of the statute only where one vein could be traced through another, then but one vein, the intersecting vein, exists in the area of intersection. If that is so, then the vein traced through in the space of intersection logically should be the property of the person who owned that vein, rather than of the prior locator, and it is reasonable to infer that the statute would have so provided. The only reasonable interpretation of the statute, is that it is drawn on the assumption that it may be impossible to tell one intersecting vein from the other in the space of intersection. Otherwise, why give the vein in that space to the one who happens to be the prior locator, rather than to the one whose vein occupies the space?

The same result follows if the test that is applied is that, where there has been an obliteration of evidence that a later vein has cut across an earlier one, other evidence must be introduced to show a difference in age and to show that in fact a later vein cut across an earlier one. Such proof, if required to establish an intersection within the meaning of the statute, would at the same time establish to which owner should belong the ore in the space of intersection, without necessity for assigning it arbitrarily to the prior locator, as

the statute does. The later vein would, by virtue of plaintiff's very definition, occupy the space of intersection.

From this reasoning it seems apparent that, while the words "intersect" and "intersection" are used to describe the geological process by which one vein cuts across another of earlier formation, in which sense a time element inheres in the use of these words, that they were not used with that limited meaning in the statute, or, consequently, in the contract of 1915. The statute was designed to regulate subsurface ownership, rather than to describe geological development.

Defendant's definition is not only a more logical one than that presented by plaintiff, but it results in a more equitable division of natural resources. Under plaintiff's construction, even though veins or vein segments meet at right angles, and are equally strong, unless one can be traced through the other the owner of one upper member, the prior locator under the statute, the plaintiff under the contract of 1915, takes both lower members. A fairer division of the earth's bounty is to give the owner of either upper member one of the lower members, and this is what the statute does.

Plaintiff envisions great difficulty and uncertainty in mining operations unless the tracing through test be accepted. It is urged that if tracing through is the test, an owner can know which downward member connects with an upper intersecting member. Without that criterion he may go off upon the wrong down dipping member. But any test involves difficulties. Under the tracing through test experts may differ as to whether tracing is possible, as they have done in this case.

We do not hold that a down dipping member however remote from an opposite up dipping member will be held to correlate with it. Nor do we hold that a lower vein however weak it may be, and unlike an up dipping fork, will be held to be the fourth member of an intersection of veins, rather than a branch of a single vein below a junction point. The question of intersection depends on a careful study of position and physical characteristics of veins and must be determined on the particular facts of each case. There are many problems in the law which admit of no other basis of decision.

Since it is our conclusion that a tracing through is not essential to establish an intersection, the question is whether, as defendant contends, the factors of position and appearance,

as a matter of law, show an intersection. As already pointed out, these were the factors, and not plaintiff's definition, that led the trial court to find there was a junction and not an intersection. The real question presented is whether, independent of the definition urged by plaintiff, and adopting the definition of defendants, as did the trial court, there is any substantial evidence to support the finding that a junction and not an intersection occurred between these two veins.

*Burden of Proof.*

Before directly discussing the sufficiency of the evidence, brief mention should be made of the contentions of the parties in relation to the burden of proof. Each party contends that the other has the burden of proof. Plaintiff urges that defendants must prove an intersection, while defendants insist that plaintiff has the burden of showing there is not an intersection, but a junction. Defendants' theory is, that since the Empire Star Mines Company is plaintiff, and its right depends on there being a junction, rather than an intersection, it had the burden of proving that there was a junction, in accordance with the usual rule that the plaintiff has the burden of proof.

Plaintiff refers to extralateral right cases involving conflicting claims between those holding mining patents from the federal government, which indicate that although the plaintiff has the burden of proof, he makes a prima facie case of ownership of subsurface minerals by showing that they lie within his surface boundaries projected into the earth. The burden of going forward is then on the defendant, who must show that the mineral beneath plaintiff's land is part of a vein which apexes outside plaintiff's boundaries, and one line of authority holds that, in addition, defendant must show that the vein apexes within defendant's surface boundaries. (3 Lindley on Mines (3d ed.) p. 2163, § 866; 36 Am.Jur. §§ 109-114, pp. 359-365.) By analogy plaintiff would apply a similar rule in this case. It claims that it made a prima facie case by showing that it owned the mineral rights to lots 6 and 7, block 18, below a depth of 200 feet from the surface, under grant from the surface owners. But the adjudication of ownership, as hereafter will be pointed out, goes beyond those lots to the extent that the workings immediately below and above the 2400 level drift extend beyond the lines of said lots. Plaintiff did not show

that the parts of such workings lying outside lots 6 and 7 were beneath lots which it owned. Upon the trial plaintiff did not rest upon a mere showing of ownership of lots 6 and 7, but, rather, set out affirmatively to prove a junction. We are of the view, therefore, that the burden was on plaintiff to establish a junction. However, we are also of the view that plaintiff has satisfactorily discharged that burden. We turn now to a discussion of that problem.

*Sufficiency of the evidence to support the finding that there was a junction.*

Plaintiff and defendants introduced into evidence models of workings of the Pennsylvania mine, and of the Golden Center mine, in which the Dromedary vein is located. These models show drifts, winzes, raises and stopes in the general area where the two veins meet. A drift is a horizontal mine passageway driven on, or parallel to, the course of a vein. A vertical or steeply inclined passageway driven to connect a mine working with another at a lower level is a winze. Where a passageway is driven from a lower level to a higher, it is a raise. Excavations formed by mining ore are known as stopes. The position of veins in a general way is indicated by the workings, since they are run on the veins. The models show that the veins here involved are vast bodies of mineral which descend into the earth and extend on strike for hundreds of feet. The average strike of the Pennsylvania vein is just off due north and south, being N.10°W. The strike of the Dromedary vein is N.40°E. The veins vary in thickness from a few inches to four or five feet. Since the apex of the Penn-yellow vein lies east of the apex of the Dromedary, and since the dip of the veins is from east to west, the Penn-yellow vein may be said to underlie the Dromedary vein.

The plaintiff's 2400 level drift was run along the Penn-yellow vein in a northerly direction for a considerable distance to the meeting of that vein and the Dromedary vein. The drift was continued without break beyond the rake of encounter along a vein which plaintiff contends is a single vein formed by a union of the Dromedary and Penn-yellow, which single vein below the junction, it is contended, is the property of plaintiff under the 1915 agreement. It is plaintiff's position that the Wiggly vein is a minor, insignificant down dipping branch of the single vein formed by the union of the Dromedary and Penn-yellow vein.

Defendants contend that where this 2400 level drift proceeds in a northerly direction after the meeting of the Dromedary and Penn-yellow veins, it is on a continuation of the Dromedary vein beyond the intersection. The vein followed by the 2400 level drift where that drift continues northerly beyond the meeting of the Dromedary and Penn-yellow is called the disputed vein by defendants. From this portion of the 2400 level drift, that is, the portion north of the rake of encounter, stoping extends up dip to the east. The stoped area, from which ore has been removed, extends some distance south of the rake of encounter of the Dromedary and Penn-yellow veins onto what is admittedly Penn-yellow vein. According to the evidence produced by plaintiff, the stoping extends up dip 80 feet south of the meeting of the Dromedary and Penn-yellow. This factor is of considerable importance, as will later appear.

It is defendants' theory that, in the area in which the stoping took place above the 2400 level drift to the north of the rake of the Dromedary and Penn-yellow veins, the veins, both Dromedary and Penn-yellow, must be said to follow a common course, which constitutes a space of intersection, notwithstanding it is not possible to identify two separate veins in that area. In defendants' analysis, as depicted on its model S, the two lower down dipping members, disputed and Wiggly, take off just above the 2400 level drift, with the result, in defendants' view, that the 2400 level drift and lower workings of plaintiff are in fact upon the downward continuation of defendant's Dromedary vein. On the model a space on the stope, just above the 2400 level drift, is colored a mottled red and yellow, indicating the area of commingling of the two veins before the separation into the disputed and Wiggly veins. Under the contract of 1915 both parties agree that the plaintiff is the owner of any vein material in the space of intersection. The basic question involved is whether there is, as defendants contend, a space of intersection, and then two veins, or whether, as plaintiff contends, after the rake of encounter, there is merely the downward continuation of a single vein formed by a junction of the Dromedary and Penn-yellow, with the Wiggly vein constituting a branch of the Pennsylvania. The drill holes through which water was introduced into the plaintiff's workings penetrate the vein below the 2400 level, that is, the disputed vein, rather than what defendants contend is the space of intersection.

The plaintiff's Go Devil raise leads up dip from the 2400 level drift, commencing at a point north of where the Dromedary and Pennsylvania meet. For the most part it is upon the Penn-yellow vein, although it is defendants' contention that immediately above the 2400 level drift it follows up the space of intersection where, in defendants' view, the two veins, Pennsylvania and Dromedary, mingle before they separate again. The lower end of the Go Devil raise is shown on defendants' model S in the mottled red and yellow which defendants use to depict what they contend is the space of intersection. The Prospect drift, a short drift, is run from the Go Devil raise in a southerly direction for a distance of 40 or 50 feet.

Below the 2400 level drift are the Y and Z level drifts, both workings of plaintiff, the Z level being the lowest of plaintiff's workings. It is conceded that these drifts are run along the same vein as the 2400 level drift north of the meeting of the Dromedary and Penn-yellow veins, that is, that they are upon the disputed vein down dip from the 2400 level drift. The Y and Z level drifts are reached by the No. 4 winze which extends down dip along the vein from the 2400 level drift, starting at a point a short distance north of the meeting of the Dromedary and Penn-yellow veins. The X level drift, on the same level as the 2400 level drift, is upon a branch of the vein followed by the 2400 level drift. The Y and Z level drifts extend on both sides of the No. 4 winze. There are large stopes between the X level and the Y level, and between the Y level and the Z level south of the No. 4 winze, and smaller stopes up dip from the Y level and Z level north of that winze. Two of the three drill holes through which the water entered plaintiff's workings penetrated the stope south of the No. 4 winze between the X and Y levels. The earliest of the three holes penetrated the No. 4 winze below the Y level.

· The models also show workings upon the Dromedary vein above its encounter with the Penn-yellow vein. The 1800 level drift of the Golden Center mine, which is upon the Dromedary vein, is but a few feet above and northwest of that portion of plaintiff's 2400 level drift south of the meeting of the Dromedary and Penn-yellow. Above the Golden Center 1800 level drift are the 1650, 1400 and 1100 level Golden Center drifts, connected by winzes along the dip of the vein. The enjoined winze extends from above the 1650

Golden Center level drift to below the 1800 level drift. Plaintiff seeks to enjoin defendant from continuing that winze downward to a point where it will break into plaintiff's workings.

■ Before directly discussing defendants' contentions as to the evidence, consideration must first be given to the argument of defendants that plaintiff has made an admission that demonstrates, to a certainty, the error of plaintiff's position. Defendants place such emphasis on this alleged admission that it may be said to constitute a cornerstone of their argument. Plaintiff emphatically denies making the alleged admission. After considering the portions of the record involved we are convinced that defendants misinterpret the evidence, and that, in fact, no such admission was made.

Throughout defendants' briefs, and on defendants' numerous diagrams, the statement is repeated many times that plaintiff has admitted that the Dromedary and disputed veins occupy the same fracture or fissure, and that the Wiggly and Penn-yellow veins occupy the same fracture or fissure. From this alleged admission defendants imply, although they do not put the thought into express words, that plaintiff has admitted that the Pennsylvania and Wiggly veins occupy a different fracture or fissure from that in which the Dromedary and disputed veins are to be found. Thus, defendants seek to put the plaintiff in the position of urging that the disputed and Penn-yellow veins are the same vein, while admitting that they are in a different fracture or fissure, and while admitting that the Dromedary and disputed veins occupy the same fracture or fissure.

Defendants do not elaborate as to their interpretation of the alleged admission—they simply state that it has been made. If they seek to imply, which apparently they do, that plaintiff admitted that the fissure occupied by the Dromedary and disputed veins came into existence at one time, while the fissure occupied by the Penn-yellow and Wiggly veins came into existence at another time, the implication is directly and unequivocally contrary to the direct positive testimony of plaintiff's experts that the cracking which produced all four veins occurred at the same moment of time. Without such an implication the admission is meaningless, and to indulge in the implication is to disregard the direct evidence of all these experts. Even if the interpretation of defendants of a portion of somewhat equivocal testimony was a possible interpretation, and even if the inference sought was a reason-

able one from the testimony relied upon, in view of the findings of the trial court, we would be required to hold that the inference must yield to positive, direct and unequivocal testimony on the issue.

' However, the error of defendants goes beyond the mere indulging in an inference rebutted by positive testimony. In addition, we think defendants misinterpret the record. An examination of the transcript demonstrates that no such admission was in fact made. The testimony relied upon to support the alleged admission, upon which the inference above discussed must be predicated, is a small portion of the testimony of the witness Buwalda appearing in the Reporter's Transcript, pp. 862 to 864. Buwalda had testified that the disputed vein was part and parcel of the Pennsylvania vein. He then sought to explain the curve which the Pennsylvania vein in the disputed area takes on the 2400 level. The gist of his testimony was, and on this the witness was unequivocal, that the fracturing which produced the Pennsylvania, Dromedary, disputed and Wiggly veins was simultaneous, but that the interaction of the stresses that produced the cracking, which he described, would be likely to produce a curve at the meeting of the two cracks. The portion of the testimony upon which defendants especially rely as an admission is the following: "A. [of Dr. Buwalda] : That is, geometrically there is probably some relation between this fracture and this fracture. Q. [of Mr. Butler] : Which is this and this? A. Between the fracture occupied by the Dromedary vein and the fracture occupied by the Pennsylvania vein, and the change of trend in the Pennsylvania vein." (Rep. Tr., p. 862.) Defendants interpret this testimony as an admission that the Dromedary vein fracture and the disputed fracture are related, by construing the witness' first reference therein to "Pennsylvania vein" as referring to the disputed vein. When defendants quote this section of testimony on page 16 of their opening brief and in other places, they interpolate in parenthesis after the first reference to Pennsylvania vein the words "i.e., DISPUTED VEIN." This insertion is unwarranted. From a reading of the testimony it would appear that the witness was referring to the Pennsylvania vein south of its meeting with the Dromedary, or to the Pennsylvania vein as including both the disputed vein and the Pennsylvania south of the meeting with the Dromedary, and was not referring solely to the disputed vein.

502

In support of the claim that plaintiff admitted that the Wiggly vein and the Penn-yellow vein occupied the same fracture, the defendants lay special stress on the following testimony: "A. [of Dr. Buwalda]: In my discussion of the northern part of the 2400, I think that something interrupted so that I never did get to the discussion of the Wiggly drift, but I would comment that the fracture along that northeast branch to the north probably was related to the curvature in the Pennsylvania fracture. Q. I see. How about the fracture that came out through the Wiggly drift? A. It may have been related to that, also. Q. By related to it, is it part of the same crack? A. Yes." (Rep. Tr., pp. 908-909.) The northeast branch to the north departs from the vein just north of the point where the Wiggly vein departs from it on the 2400 level. It is not entirely clear to what the words "it" and "that" refer. Does "it" refer to the Wiggly vein, or to the northeast branch to the north? If "it" refers to the northeast branch to the north, the witness has said that such branch (which defendants contend is disputed, that is, Dromedary) is related to the Wiggly. This possible interpretation is, of course, not acceptable to defendants. On the other hand, if "it" refers to the Wiggly vein, then the word "that" refers either to the northeast branch to the north, or to the curved portion of the vein north of the admitted Dromedary, that is, the disputed vein, which plaintiff contends is Pennsylvania, or to the Pennsylvania vein as plaintiff's witnesses find it curving both north and south of its meeting with the Dromedary. There is certainly no statement that the Wiggly vein is related to or in the same crack as the Pennsylvania confined to the segment south of its meeting with the Dromedary.

It is quite clear that the natural and ordinary meaning of the testimony upon which defendants rely to find an admission by plaintiff is that all the veins—Pennsylvania, Dromedary, disputed and Wiggly—are part of the same crack, in that the fracturing was simultaneous, and that to read any other meaning into this testimony is to distort it. It follows that the implication sought to be conveyed is not only rebutted by positive testimony, but also that the evidence relied upon to raise the inference does not, in fact, support it.

Defendants next contend that the evidence of location and appearance of the veins demonstrates, as a matter of law, that the disputed vein is a continuation of the Dromedary, and that there is an intersection and not a junction of the

Dromedary and Pennsylvania veins. They first urge that dip and strike figures in the vicinity of the meeting of the Dromedary and Pennsylvania veins, taken from the maps introduced as exhibits, principally from plaintiff's Exhibit 10, demonstrate, as a matter of law, that the disputed vein is a continuation of the Dromedary vein below its intersection with the Pennsylvania, and that the Wiggly vein is the continuation of the Pennsylvania below the intersection. In determining the identity or continuity of veins defendant contends that the most important test is their position as determined by strike and dip. Defendant says: ''The commonest and most important and the decisive test of intersection or junction (or which amounts to the same thing) of identity of veins, is the relative position of the parts of veins.'' (Op. Br., p. 110.)

· The court found that the Pennsylvania vein has a strike varying somewhat, but generally north and south, with ''a dip averaging between 30 and 40 degrees on its downward course through the stopes and workings to the lower levels and drifts. It is much flatter in dip in places, for example, in the Go Devil raise, and is steeper than average in other places.'' (Cl. Tr., p. 66.)

As to the Dromedary, the court found that in the vicinity of the 1650 and 1800 levels, ''and especially where the Dromedary vein approaches the Pennsylvania vein, it is a steep dipping vein of approximately 70° and has an average N.40°E. strike'' (Cl. Tr., p. 70), and that the ''steep dipping Dromedary vein with its different strike, approaches the flatter dipping Pennsylvania vein and merges into and joins the Pennsylvania vein.'' (Cl. Tr., p. 71.) The findings do not separately set forth the dip and strike of the disputed vein, which is found by the court to be part of the Pennsylvania vein, nor is there a finding as to the dip and strike of the Wiggly vein. The only reference in the findings to this last mentioned vein is the following: ''The main Pennsylvania vein does not disappear into the hanging wall of the Dromedary vein in the 'Wiggly' drift as defendants have contended. Said 'Wiggly' drift is run for a short distance on a minor and unimportant hanging wall branch of the Pennsylvania vein, which branch then passes out of one of the walls of the drift and is not disclosed any further.'' (Cl. Tr., p. 72.)

Defendants observe that the average strike of the Pennsylvania vein on the 2400 level drift for a distance of 590 feet immediately south of its meeting with the Dromedary vein is N.15°W., and for a distance of 102 feet immediately south of its meeting with the Dromedary, it is N.35°W. (See table, Cl. Br., p. 109.) The average strike of the Dromedary vein as found by the court in accordance with defendants' figures is N.40°E. A northerly segment of the disputed vein followed by the 2400 level drift, measured not from a point immediately north of the meeting of the Dromedary and Penn-yellow, but from a point considerably to the north of such meeting, has a strike of N.40°E. On these figures defendants base their contention that the Dromedary and disputed veins correlate closely on strike, and that the Penn-yellow and disputed do not. But in between the southerly segment of the drift with a northwest strike and the northerly segment with a northeast strike, the drift has a course more nearly north-south. It is this segment which lies immediately north of the meeting of the Dromedary and Penn-yellow. The more nearly north-south strike represents the course of the vein in what defendants contend is the area of intersection where, in their view, the veins follow a common course.

If the disputed vein is the Penn-yellow north of the junction with the Dromedary, as plaintiff contends, then the Penn-yellow vein at the level of the 2400 drift describes a westerly bow south and north of its meeting with the Dromedary. Plaintiff's witnesses explained that bow, by the statement that the coming together of two fractures, such as the Pennsylvania and Dromedary, would be likely to result in a departure of the position of the veins from their normal course—that the natural effect of such an occurrence would be an area of distortion, which, in this case, took the form of the Penn-yellow bowing westerly. The measurements which were used in computing the strike of N.35°W. for the Penn-yellow vein south of its meeting with the Dromedary were taken upon the arc of the bow as it departed from the nearly north-south strike of the vein, while the measurements which lead to the strike of N.20°E. for the disputed vein were taken upon the complementary arc of the bow before the vein had returned to its general more nearly north-south strike. Plaintff emphasizes the fact that for approximately 160 feet north of the meeting of the Dromedary and Penn-

sylvania, between these two arcs, including the area where defendants contend the veins commingle, the strike is almost due north and south.

There is also this significant factor that supports the finding of junction. The upper part of the large stope above the 2400 level extends south of the rake of encounter of the Penn-yellow and Dromedary veins, for a distance of 80 feet up dip. It is admitted that south of the rake of encounter the stoping is on Penn-yellow vein. North of the rake of encounter, the upper part of the stope is upon the disputed vein, which defendant contends is Dromedary. The stoping has the same strike and dip immediately north and south of the rake, indicating that the vein material had the same strike and dip. Thus defendant is in the position of contending that the vein suddenly becomes the downward continuation of his Dromedary vein although it has the same strike and dip as the Penn-yellow vein just south of the rake.

Another factor which led the trial court to find a junction was the physical situation relative to the Dromedary vein. The court found that along the rake of encounter of the Pennsylvania and Dromedary vein the ''Dromedary vein and its walls 'roll' into the main Pennsylvania vein,'' (Cl. Tr., p. 71) and that ''the rolling of the weaker and steeper dipping Dromedary vein into the stronger and flatter dipping Pennsylvania vein establishes that a union of the two veins takes place. . . .'' (Cl. Tr., p. 72.) The plaintiff's witnesses testified as to the existence of this roll, and photographs were introduced showing the roll. It appears that this roll of the Dromedary consists in that vein changing its course rather sharply on dip to conform to the dip and strike of the Pennsylvania vein south of the encounter, indicating that the vein beyond the meeting should be held to be Pennsylvania, rather than Dromedary or a commingled area of intersection. Defendants attempt to minimize the significance of this roll, pointing out that the Pennsylvania vein itself is a rolling or undulating vein. But such roll is obviously a different matter from the roll which takes place where one vein changes course to assume the position of another.

Defendants contend that the so-called westerly bow in the Pennsylvania vein is obtained on the 2400 level by ''jumping'' from the Pennsylvania, south of the rake of encounter, to the disputed vein north of that meeting, instead

of following the Pennsylvania vein out the Wiggly vein; that a bow is not found on the levels of the disputed below the 2400 level drift, nor in the Pennsylvania vein above the 2400 level, which indicates that the bow results from jumping from the Pennsylvania vein to the disputed vein on the 2400 level where they are both present. The question whether the Pennsylvania vein formed such a bow was a question of fact to be decided by the trial court. Its finding, based on the testimony of plaintiff's experts, must be held to be supported by the evidence.

The parties also analyze the figures for the dip of the veins to support their respective contentions. The disputed vein is steeper than the Pennsylvania vein in the Go Devil raise, and not so steep as the Dromedary vein. The court did not separately find the dip of the disputed vein. Defendants calculate it at 43° 15′ from the 2400 level drift to the Z level drift, the lowest depth to which it has been followed. Plaintiff contends that it is not that steep, since the dip taken down the number 4 winze, which follows the vein, is admitted by witnesses on both sides to be 34°. Accepting defendants' figure of 65° 54′ as the dip of the Dromedary from the 1650 Golden Center level to the 2400 level, and their figure of 43° 15′ for the dip of the disputed vein, the difference is 22° 39′. The court found that the Dromedary where it approached the Pennsylvania vein had a dip of 70°. This finding is based on dip figures taken on a single level, the Golden Center 1800 level, which is but a few feet above the Pennsylvania 2400 level. The dip figure of 65° 54′ is an average of dip figures taken from the Golden Center 1650 level to the Pennsylvania 2400 level. Using the 70° dip figure found by the court, and the figure of 34° as the dip of the disputed vein, the difference is greater than calculated by defendants, the Dromedary vein being much steeper.

The Pennsylvania vein in the Go Devil raise is admittedly less steeply inclined than the disputed vein. Defendants calculated the dip to an average of 20° 51′ for a distance of 375 feet in the Go Devil raise, a difference of 22° 24′ from the dip of the disputed vein, accepting defendants' figure of 43° 15′ as the dip of the disputed vein below the 2400 level. But, as plaintiff points out, the 43° 15′ figure is for the dip of the vein below the 2400 level drift. Plaintiff notes that the vein in what defendants contend is space of intersection between the Pennsylvania vein in the Go Devil raise and the

disputed vein gradually steepens, and plaintiff also empha-
sizes the fact that the vein material in the upper part of the
stope above the 2400 level immediately north and south of
the rake of the Dromedary and Pennsylvania has the same
dip on both sides of the rake, as it has the same strike. Yet
defendant contends that on one side of the line the vein is
Dromedary while admitting that on the other it is Pennsyl-
vania.

Defendants next contend that the correlation be-
tween the Wiggly vein and the Pennsylvania vein is even
closer than that between the Dromedary and disputed, so close
that the Wiggly, they contend, must be held to be the down-
ward continuation of the Pennsylvania, leaving the disputed
as the down dipping continuation of the Dromedary. The
strike of the segment of Pennsylvania vein south of its meet-
ing with the Dromedary for a distance of 102 feet, as noted
above, is N.35°W. The strike of the Wiggly vein as it takes
off from the 2400 level drift north of the meeting is N.38°W.,
a difference of only 3°. Defendants here compare the strike
of the Wiggly vein with a segment of Pennsylvania vein
which, in the testimony of plaintiff's witnesses, is in an area
of distortion. The defendants compute the dip of the Penn-
sylvania vein in the Go Devil raise at 20° 51′, that of the
Wiggly vein at 20°. But the court found on competent evi-
dence, to which we shall hereafter refer, that the Wiggly
vein was a minor and unimportant feature. The fact that
such feature correlates on strike and dip with a segment of
Pennsylvania vein does not require a holding that, as a matter
of law, there is an intersection of veins, and that the unim-
portant Wiggly vein is the downward extension of the Penn-
sylvania vein, thus leaving the valuable disputed vein as the
continuation of the Dromedary and the property of defen-
dants.

The models show, in line with plaintiff's testimony,
that in the vicinity of the encounter of the Dromedary and
Pennsylvania veins on the 2400 level there is an area of distor-
tion in position of vein material. The trial court had the configu-
ration before it as depicted by models and heard the testimony
of the witnesses, on the basis of which it was warranted in
finding that the Pennsylvania vein commenced to bow west-
erly before the Dromedary encountered it from above, and
that the arc north of the meeting was the other part of a bow

in the vein, a situation not unusual where two veins encounter each other according to plaintiff's witnesses. In this analysis the Pennsylvania vein as a continuous sheet passes beneath the Dromedary vein, which comes down from above to join the Pennsylvania, but does not pass through it, nor continue beyond it.

Defendants' definition of intersection depends largely on position, with other physical characteristics a secondary feature. Defendants refer to an intersection of streets by way of analogy. But, obviously, and defendants do not contend to the contrary, an encounter of two ore bodies descending downward into the earth will not have the same regularity and freedom from complexity characteristic of street intersections. To the existence of an intersection there must be four members. If that which is claimed to be the fourth member is insignificant in comparison with the other three it may well be held that its relation is that of a branch of a single vein formed by a union of two upper members, rather than that there is an intersection. In the case herein the trial court was of the view that the Wiggly vein was such a feature. It found, as noted above, that the Wiggly vein was a "minor and unimportant hanging wall branch of the Pennsylvania vein," (Cl. Tr., p. 72) which passed out one of the walls of the drift and was not disclosed any further.

The defendants take issue sharply with the court's finding as to the Wiggly vein. In defendants' analysis of the evidence the Wiggly vein is a strong feature closely resembling the Pennsylvania vein. The Wiggly vein was exposed in the Wiggly drift, which was run for a distance of about 200 feet. The vein was found to be unproductive of ore of commercial value in that distance, and hence is without stoping. Exploration ceased because of the opinion of those in charge that the vein was without commercial value.

Defendants note that the Pennsylvania vein in the 2400 level drift for a distance of 570 feet immediately south of the meeting of the Pennsylvania and Dromedary had no stopes, indicating that it also was commercially unproductive in that distance, and plaintiff's own witnesses testified that the Pennsylvania vein in the Go Devil raise lacked ore. It appears, however, that the Dromedary also is unproductive in the area of its encounter with the Pennsylvania. There is no stoping on the Golden Center (Dromedary vein) 1800 level drift, which is a few feet above the Pennsylvania 2400

level drift. On the next drift above, the Golden Center 1650 level, stoping commences more than 700 feet south of the meeting of the Dromedary and Pennsylvania. It cannot, therefore, be argued that the Dromedary and disputed vein in the area of the meeting of the Dromedary and Pennsylvania resemble each other in that the Dromedary, like the disputed, is productive. Not only is the disputed vein productive, but that area above the 2400 level through which defendants contend the veins commingle was productive immediately to the north of the rake of encounter of the Dromedary and Pennsylvania, and, what is most important, this area of great productivity continued south of the rake, the stoping extending up dip 80 feet on what is admittedly Pennsylvania vein. Thus the Pennsylvania, rather than the Dromedary, is productive as it approaches its meeting with the Dromedary, which productive area exists both north and south of the meeting, at the same strike and dip. Plaintiff's witness Buwalda testified that an area where veins meet was likely to be highly productive.

The court found that the Pennsylvania vein was a dominant, persistent feature over a wide area. The evidence supports this finding as to the general nature of the Pennsylvania vein, notwithstanding the vein is admittedly barren of ore over not inconsiderable distances and in places pinches down to a small feature, as in the Go Devil raise. In this quality of barrenness the Pennsylvania vein in its approaches to the Dromedary resembles the Wiggly, except for the important factor that the productive area in the large stope above the 2400 level drift continued south of the meeting 80 feet up dip over a productive area admittedly Pennsylvania vein. The portion of the vein which defendants contend is the area of intersection where the two veins commingle is highly productive and this high productivity continues on down the disputed vein. The Wiggly vein was disclosed in the Wiggly drift to be dipping southwesterly and would soon encounter the disputed vein, and there was evidence on behalf of plaintiff that up dip 12 feet above the main 2400 level the Wiggly vein joined with the north south spur taking off north of the Wiggly vein, which spur defendants contended was Dromedary, and there the Wiggly ceased to be a separate vein or branch. Plaintiff's witness Nobs testified that as he followed the vein out the Wiggly drift it just about "pinched out." The court was unwilling to believe that the

strong dominant Pennsylvania vein would end thus in a vein in the position and of the character of the Wiggly vein.

Paragraph V of the findings includes the following: "The Pennsylvania vein has a strike varying somewhat, but it is generally north and south and is properly described as a dominant and persistent vein. (117 Fed. 509.)" The citation is to *Pennsylvania Consol. Min. Co.* v. *Grass Valley Expl. Co.*, decided in 1902. It was the theory of plaintiff herein that the cited case involved the same Pennsylvania vein as the present case, but nearer the shaft and at a much higher level than the instant case. The record herein supports this contention of plaintiff. The controversy in the cited case differed from that in the instant case, but the opinion of the Circuit Court noted that the evidence there showed that the Pennsylvania vein was a dominant, persistent vein. The defendants herein contend that the citation of the federal case in the findings indicates that the court herein relied on the decision in the federal case to establish a fact in this unrelated case between different parties. The finding herein is supported by evidence introduced on the trial of the present case. The reference to the federal decision is incidental.

The defendants place special emphasis on their photographic exhibit A with which they confronted plaintiff's witness Simkins without identifying the place where the photograph was taken. The witness testified to the photograph showing a vein about 14 inches wide, as measured by a hammer driven into the rock wall at the top of the vein to show the scale of the photograph, and that it appeared to be a strong feature. He testified that it looked like Pennsylvania, rather than Dromedary. The photograph was then identified as having been taken near the end of the Wiggly drift. There is no showing, however, that the vein, whatever its width, carried ore. All the testimony was to the effect that the vein did not carry ore in commercial quantities. As to the vein looking like Pennsylvania, rather than Dromedary, the court found that the Wiggly was a minor and unimportant branch of the Pennsylvania. Witnesses for plaintiff testified to photographs sometimes being misleading in suggesting a situation not borne out by actual examination of the underground workings. In this instance the witness Simkins testified that the vein looked strong in the photograph, but that underground it was a weak feature.

The court found differences in the appearance of the

Pennsylvania and Dromedary veins. As to the Pennsylvania vein the court found that it is continuous and well defined with gouge lying between the veins and the walls, that it is seldom if ever frozen to the walls and not infrequently it consists of two or more strands of quartz, with gouge and "formation" consisting of crushed rock. One of its characteristics, the court found, is its branches and spurs. The court made no separate finding as to the appearance of the disputed vein but included it within the description of the Pennsylvania vein.

The court found that the Dromedary vein in the vicinity of its meeting with the Pennsylvania, as compared with the Pennsylvania, has a noticeable lack of gouge, that in many places it is frozen and tightly attached to its walls, that it is a narrow feature pinching down in places to an inch or two in width.

Defendants contend that the court's finding as to the Pennsylvania vein is not true of that vein within 300 feet of its meeting with the Dromedary; that in fact the characteristics of the veins are interchangeable, sections of each resembling sections of the other; that some of plaintiff's witnesses testified that sections of the Dromedary could not be distinguished from sections of the Pennsylvania. But, as one of the witnesses for plaintiff put the matter, it may be impossible to identify two men from their shoes alone, but when the men are viewed at full height there is no difficulty at all. The thought of the witness was that each vein, considered over a broad area, had characteristics which distinguished it from the other. Since the veins were part of a vein structure of simultaneous origin, according to plaintiff's witnesses, it was to be expected that they would not differ widely in their characteristics, and that sections of one might closely resemble sections of the other. The determination of the identity or continuity of veins in this case was a difficult one, in which it was necessary for the court to arrive at a decision on the basis of the only evidence available. If the evidence is not as clear and decisive as might be desired, the difficulty inheres in the nature of the problem presented by the underground vein structure. It was necessary that the court base its decision on the differences found, although the distinctions were not as marked as one would hope to find.

It is true that both veins are unproductive in the area just before they encounter each other, except for the 80 feet

of stoping on the Pennsylvania south of the meeting, and in these unproductive areas both are narrow features. But the court was of the view that the disputed vein, a highly productive area, had the characteristics of the Pennsylvania in its productive areas. The characteristics of the productive disputed vein differ from the characteristics of both Dromedary and Pennsylvania immediately south of the meeting, except as they resemble the attributes of the vein in the 80 feet of stoping immediately south of that meeting, which is admittedly Pennsylvania. In this situation correlation of characteristics of the productive disputed vein with productive areas of the Pennsylvania over a wide extent and with the productive area of the Pennsylvania in the 80 feet of stoping immediately south of the meeting, the only productive area in the vicinity of the meeting, was properly considered by the trial court in reaching its conclusion that the disputed vein was Pennsylvania. The testimony of those of plaintiff's witnesses who had participated in mining operations on the disputed vein and in the vicinity of the rake of encounter of the two veins is important. (*Pennsylvania Consol. M. Co.* v. *Grass Valley Expl. Co.*, 117 F. 509; *Carson City G. & S. Min. Co.* v. *North Star Min. Co.*, 73 F. 597; *Star Mining Co.* v. *Federal Mining & Smelter Co.*, 265 F. 881; *Cheesman* v. *Shreeve*, 40 F. 787.)

Defendants contend that what plaintiff has done is to describe as a double junction what is in fact an intersection; that where there is a junction the configuration of veins resembles the letter Y; that where there is an intersection the veins are in the position of a letter X. In defendants' view plaintiff has refused to recognize the existence of the X formation by the device of saying that there are two junctions, a double junction, in effect two Vs with the points together. The formation possesses no such regularity as is found in the letters of the alphabet. Moreover, to arrive at the X configuration defendants are forced to treat the weak insignificant Wiggly vein as the fourth member of the cross. Upon the basis of the testimony as to position and other characteristics the court found that the veins joined and that the Wiggly vein was a down dipping insignificant branch of the single vein below the junction. As to Diagram II, which is repeated many times in defendants' briefs and represents a cross section of the veins, plaintiff points out that it gives a distorted impression in that it is taken almost at right

angles to the strike of the Dromedary vein, with the result that the trace of that vein on the section would approximate its true dip, but it is not at right angles to the strike of the Pennsylvania vein. This argument as to the so-called double junction adds nothing to defendants' position. The finding that there was a junction is supported, and that is conclusive on this phase of the controversy.

Defendants find proof that the disputed vein is the Dromedary in the fact, as defendants claim it to be, that both the Dromedary and the disputed vein are affected in the same manner by what are called "northeast crossings," while the Pennsylvania vein is not thus affected. Plaintiff concedes that the Dromedary is thus affected, but denies that the disputed vein shows any such condition. Since the Dromedary admittedly shows this phenomenon and the Pennsylvania admittedly lacks it, the important question is whether it appears in the disputed vein.

The crossings are steep-dipping structures with a northeast strike. They do not carry ore except occasionally for a short distance where they meet a vein. It is conceded that there are a number of them and that they form intersections with both the Dromedary and Pennsylvania veins. Defendants' witnesses testified that the structure formed by the contact of the Dromedary vein with these crossings was unique, that they had not observed it on the Pennsylvania or elsewhere in the district. Defendants' witness Tolman likened the formation to a staircase. He thus described it: "This structure is developed by quartz that at one place takes the trend of a flatter structure, a little flatter, and then climbs along a steeper structure, takes a flatter dip and then climbs a steeper structure. It was the most striking feature, without any question, in the Dromedary area that I saw. That structure is only developed where a swarm of these northeasters, steep northeasters, cross. Where the northeasters are not found in the vein then that staircase is lost and the vein goes up at a somewhat gentler dip. In other words, in my opinion, the structure is due to the fact that these northeasters become an integral part of the vein between walls and this steep structure then is developed by the two elements of the vein, the steeper northeaster and a flatter vein, which also has a northeasterly strike. . . . This steep structure developed in this way, I think, is unusual. Personally, I have

only seen it in the Dromedary and as far as the literature goes, and as far as I know, it has only been described in the Dromedary." (Rep. Tr., p. 1578.)

The defendants' witness Kildale testified as follows: "It [the vein] tends to follow the northeast steep structure for greater or less distances and then often has a tendency to flatten off and jump, as it were, from one steep northeaster to another, and then it follows another northeaster, both on strike and dip, and then may turn off from one northeaster to another. It has variation from NE, a structure similar to the so-called Grass Valley crossing, to a flatter structure." (Rep. Tr., p. 1507.)

Thus the defendants draw a picture of the Dromedary vein immediately above its meeting with the Pennsylvania as jumping from one northeast crossing to another, becoming a part of such a crossing and assuming its steeper dip for a distance, then leaving such crossing to proceed at a flatter dip until it encounters the next northeast crossing, which it follows to depart again to reach a subsequent crossing. Both plaintiff's and defendants' witnesses are agreed that such a formation is not found where the crossings encounter the Pennsylvania vein, which does not assume for any distance the path of the crossing. The parties are, however, in sharp disagreement as to whether this staircase type of structure is to be found in the disputed vein. Defendants do not claim that it is to be found in the disputed vein except in that vein as shown in the Z level, and then only at the ends of the drift on that level. The flatter dip of the disputed vein where the No. 4 winze follows it is explained by defendants as due to the circumstance that the vein there lies between steep crossings, and the winze follows the shallower aspect of the vein.

The court found: "Both the Pennsylvania and Dromedary veins encounter what have been referred to in the testimony as 'northeast crossings' which appear to form intersections with the veins where encountered, but these crossings seldom carry mineral in paying quantities and are of a steep dip. They are separated and unrelated features which lend no material aid to a determination of the critical issue concerning intersection or junction of separate veins." (Cl. Tr., p. 70.)

The plaintiff's witnesses testified categorically that they had not observed the staircase structure in the ends of the Z

level drift, or any place else on the disputed vein. They admitted that steep structures were found there, but denied that they united with the vein to form the staircase type of structure. In plaintiff's analysis the steep structures encountered in the ends of the Z drift were small branch veins, or lacers. The plaintiff's witnesses testified that in the wedge formed between veins coming together it was a common phenomenon to find stringers or lacers running from one vein to the other.

The question is clearly one of fact. The evidence is not in such condition that we can say, as a matter of law, that defendants have demonstrated that the staircase structure characteristic of the Dromedary vein is also found in the disputed vein. To decide this question in defendant's favor would be to accept the testimony of defendants' witnesses while denying validity to the testimony on behalf of plaintiff. It was the province of the trial court to resolve conflicts in the evidence.

Defendants counter with the assertion that plaintiff's witnesses, while denying in their verbal testimony that the staircase structure is found in the Z level, have depicted it on their maps. What the maps show in this particular was a subject for the experts. As a non-expert in the field of geology and mining engineering this court cannot say, in opposition to the testimony of plaintiff's witnesses, that the maps show a staircase structure in the disputed vein. There may be features revealed so plainly by a map that expert testimony to the contrary would palpably be false, but this matter is not of such nature. The absence of the staircase structure in the disputed vein thus is a circumstance correlating the disputed with the Pennsylvania in which, admittedly, that structure was not found.

Defendants next contend that further evidence that the disputed vein is the Dromedary is to be found in the fact that from the disputed vein on the 2400 level north of the Wiggly drift there is a spur called the north spur which correlates with spurs found north of the enjoined winze in the Dromedary 1650 and 1400 level drifts. This indicates to defendants that the spurs as revealed in the 2400 level of the disputed and the 1650 and 1400 level of the Dromedary are part of a continuous vein sheet which forks off from the Dromedary. Defendants find a close correlation between the strike and dip of the north spur drift and the spurs on the Dromedary 1650 and 1400 levels, known as West Dromedary.

516

Plaintiff's witnesses deny that such a correlation exists. They point to the fact that the strike of the spur called West Dromedary on the 1400 level, as shown on defendant's diagram XVII (Op. Br., p. 203), differs radically from that of the spur shown on the 1650 level, which indicates to plaintiff that there is not a continuous vein sheet downward from the Dromedary 1400 level to the Dromedary 1650 level, and thence down to the 2400 level on the diputed vein. These spurs are found by plaintiff's experts to be "erratic and inconsequential." Under the circumstances, the determination of the trial court that this factor was not convincing cannot be disturbed.

Defendants' witnesses testified to finding both the Dromedary and Pennsylvania in the so-called Fishtail stope, a northeast extension of the large stope above the 2400 level drift. In the view of defendants' witnesses the two veins separated in this area, the Pennsylvania to continue downward as the Wiggly vein, the Dromedary as the disputed vein. Defendants emphasize the fact that in this area one stope lies just above another, as indicating that there are two intersecting veins there. But plaintiff's experts testified that these overlapping stopes are on branches of the Pennsylvania vein. The trial court accepted plaintiff's explanation and found that the steep structure which appeared in the raise was a lacer within the walls of the Pennsylvania vein. This finding, under the circumstances, cannot be disturbed.

Defendants object that if there was a junction of the Dromedary and Pennsylvania veins, as plaintiff contends, the Pennsylvania vein must exist south of the line of junction and that it was not shown to exist there in the Y and Z level drifts. Defendants analyze the testimony of plaintiff's witness Hardy as constituting an admission that he based the existence of the Pennsylvania vein south of the junction in those drifts on his "blind guess." In plaintiff's view Hardy meant not that he based the existence of the vein south of the junction on his own blind guess, but that his statement as to just where the vein would be found beneath concealing rubble shown in the photograph concerning which he was testifying was a "blind guess." The trial court apparently agreed with this interpretation of the evidence. We agree with the trial court.

Defendants contend that they were prevented from obtaining relevant evidence by the plaintiff's denying defen-

dants' engineers access to certain workings in violation of inspection orders made by the court. Defendants hoped to find evidence in the places to which they were denied access of another intersection between the Dromedary and Pennsylvania veins. If the veins encountered each other in those places the meeting would be a different one from that in the vicinity of the No. 4 winze, upon the nature of which depends the ownership of the disputed vein. The existence of an intersection at the places to which defendants were denied access would not establish that the encounter south of the No. 4 winze was an intersection, rather than a junction. The testimony on behalf of plaintiff was that the workings to which defendants claim plaintiff denied them entry were inaccessible because filled with water and debris from plaintiff's mining operations. Plaintiff urges that defendants desired through inspecting workings remote from the controversial area to obtain information relevant to other litigation with plaintiff.

The questions as to the extent to which defendants should be permitted to examine plaintiff's workings, and as to whether plaintiff refused to permit inspection to the extent directed by the court's orders were matters for the trial court as to which no abuse of discretion appears from the record.

*Conclusion on evidentiary issue.*

On the issue of whether there was a junction or an intersection, the trial court was presented with a typical fact problem—did the two veins intersect or form a junction? The plaintiff's experts gave a definition of "intersection" that the trial court refused, and, in our opinion, properly refused to adopt. The trial court determined that this issue should depend upon the appearance of the veins, their position, their strike and dip as they approached the meeting, the fact the Dromedary vein rolled into the Pennsylvania vein, and other facts. The experts of plaintiff, as already pointed out, testified that from appearance—gouge, whether the vein was frozen to walls, formation, etc.—if a large enough area of the veins was diclosed, they could identify the Pennsylvania vein and could distinguish it from the Dromedary. They positively identified the disputed vein as a continuation of the Pennsylvania. The evidence also shows that the strike and dip of the admitted Pennsylvania vein in the stoped area immediately south of the rake of encounter is similar to the

strike and dip of the vein immediately north of the rake of encounter. There is substantial evidence that the Dromedary rolls into the Pennsylvania along the rake of encounter. The evidence shows that what would have to be the fourth member were there an intersection—the Wiggly vein—is a weak, insignificant branch or spur of the Pennsylvania, and not the main Pennsylvania vein. The trial court, in disregard of the definitions given by plaintiff's witnesses, based upon all of the above mentioned evidence, found that there was a junction and not an intersection. That finding, being supported by substantial evidence, cannot be successfully attacked on this appeal.

*Contentions in reference to the scope of the judgment.*

*A. Propriety of adjudication of ownership of the disputed vein.*

Defendants attack the form of the judgment in several respects. They first urge that the issue of ownership of the disputed vein was not properly before the court, and that it was error to pass upon that issue. Defendants' thought is that, because the water artificially introduced through the drill holes eventually reached those portions of plaintiff's workings that defendants concede are located on the vein owned by plaintiffs, and because the defendants concede that the introduction of water into those workings constituted a trespass, that it was not necessary for the trial court to determine the ownership of the vein where the drill holes broke through. Defendants have even expressed a willingness to have any such further trespasses enjoined. (Op. Br. p. 4.)

Defendants' position is unsound. Throughout this controversy plaintiff has always claimed ownership of the disputed vein into which the drill holes penetrated. The complaint so alleged. Defendants not only denied the allegations of the complaint on this isue, but affirmatively alleged ownership in defendant Cooley Butler, in the following language (Cl. Tr., p. 52): "In further answer thereto these defendants allege that at all places in the Pennsylvania mine and in the said 2400 level thereof whereat trespass is alleged in the complaint herein to have taken place, and at all places therein whereat trespass is alleged in the complaint herein to be threatened, and at all places therein in respect to which any relief is sought in the complaint including the said lots 6 and 7 below a depth of 200 feet from the surface, the defen-

dant Cooley Butler now, and at all times heretofore is, and has been the owner of all and each thereof and that any claim of the plaintiff to said places and lots is without any right whatever and that the plaintiff has no estate, right, title or interest whatever, and defendant, Cooley Butler, is entitled to the possession thereof, . . .''

The original answer affirmatively requested that defendant Cooley Butler have judgment that he owns the property where the alleged trespasses occurred, were alleged to have occurred, or were threatened. When the case came on for trial, and before the opening statements were made, defendant deleted his prayer for judgment of ownership, and asked only that plaintiff take nothing and that defendants have judgment for their costs of suit and for such other and further relief as might be just and applicable. But the allegations of the answer, which stood also as the answer to the amended complaint filed thereafter, were not changed, and the case was tried on the theory that ownership was the decisive issue, and that that issue depended on whether there was a junction or intersection of the Pennsylvania and Dromedary veins. In his opening statement defendants' counsel stated, in response to a question by the court, that the sole issue was whether there was a junction or intersection, and that the whole future of defendants, not only in this case, but in other matters, depended on that point. (Rep. Tr., pp. 31 and 32.) In view of these factors, defendants cannot by admitting now that a trespass took place elsewhere, deprive plaintiff of the right to an adjudication that a trespass took place where the drill holes penetrated and where the water flowed into workings on the disputed vein. The damages which plaintiff sought for removal of the water introduced through the holes were for removal from the area immediately surrounding the holes, as well as for removal after it reached plaintiff's workings admittedly on plaintiff's vein. The scope of the judgment must be determined in the light of the pleadings and the issues as made upon the trial. So considered, the trial court properly included within the judgment a determination of title of the disputed vein.

*B. Should the adjudication of ownership have been limited to the area beneath lots 6 and 7, block 18?*

Defendants vehemently urge that the judgment goes beyond the issues in another respect. It is contended that,

if title to the disputed vein was in issue (and we have held it was), the adjudication of ownership, and the relief dependent thereon, should have been confined to the area vertically beneath lots 6 and 7, block 18, and that the court should not have adjudicated title to the portions of the disputed vein lying outside that area. We are of the opinion that the issues as framed by the parties compelled the trial court to make findings as to the title to the vein beyond the limited area located beneath lots 6 and 7 of block 18.

The allegations of the amended complaint, filed after the trial commenced, follow, in most respects, those of the complaint. The complaint alleges that plaintiff owns a mine known as the Pennslyvania mine, which includes the 2400 level drift; that that drift is on the main Pennsylvania vein and more than 1200 feet vertically beneath the surface; that the vein apexes east of Auburn Street; that the 2400 level drift on the Pennsylvania vein passes beneath lots 6 and 7, block 18, Grass Valley Townsite; that plaintiff owns the mineral rights in these lots below a depth of 200 feet from the surface.

Paragraph IV contains the following: "In and beneath said Lots 6 and 7 of Block 18, plaintiff's said predecessors in interest constructed a winze, known as the No. 4 winze, leading down from said 2400 level to a depth of approximately 200 feet, a drift at the bottom of said winze running on said Pennsylvania vein at right angles to said winze and stopes, extending from said drift on both sides of said winze, upward on said vein to a short distance below the said 2400 level." Thus the complaint describes the No. 4 winze, the drift at the bottom of it, and the stopes extending upward from the drift on both sides of the winze as "in and beneath said Lots 6 and 7 of Block 18." In fact, the evidence shows that the Z level drift at the bottom of the winze only crosses the southwest corner of the area bounded by the lot lines projected beneath the surface and otherwise lies entirely without those lines. Plaintiff has never contended otherwise. The Y drift, lying between the 2400 level drift and the Z drift, and the X drift on the same level as the 2400 level drift, are not referred to in the complaint. The X drift is entirely within the lot lines; the greater part of the Y drift is within, but it extends a short distance south of the south boundary of lot 7. The greater portion of the stoped area below the 2400 level lies within the lines of lots 6 and 7 projected

downward, but there is stoping both north and south of those lines. Thus the undisputed fact, as shown by the evidence, is that plaintiff's workings below the 2400 level drift for the most part lie beneath lots 6 and 7, but that they do extend beyond the lot lines.

As to the drill holes of defendants, it is alleged that they penetrated "said workings of plaintiff below the 2400 level of the Pennsylvania mine." The word "said" in the phrase "said workings" can refer only to the workings described in paragraph IV, quoted above, that is, to workings beneath lots 6 and 7. The water introduced through the drill holes is also described as passing "into said workings in plaintiff's mine below said 2400 level."

The drill holes in fact penetrate the vein within the lot lines. The water which passed through the holes did not, of course, confine itself to such part of the plaintiff's workings below the 2400 level as were within lots 6 and 7, but spread into the workings as they extended beyond the lot lines.

As to the defendant's winze, referred to in the trial as the enjoined winze, it is alleged that it was being driven into lots 6 and 7 at a depth of more than 200 feet below the surface, and that it was pointed toward and penetrating within the vertical bounding planes of those lots. If defendants continue the winze, the complaint proceeds, it will shortly break "into plaintiff's workings on and near said 2400 level of the Pennsylvania mine." As constructed downward at an angle, the winze had in fact reached a place where it was well within the lot lines.

It is thus true that in the complaint as originally filed plaintiff based the rights which it claimed in this case on ownership of lots 6 and 7 below a depth of 200 feet from the surface. It alleged: "Plaintiff bases its claim of ownership of said vein and the workings thereon in Lots 6 and 7 of Block 18 upon the ownership of all of said lots below a depth of 200 feet from the surface, and upon the open, peaceable, quiet and undisturbed possession of said vein and workings by plaintiff and its predecessors in interest." Pursuant to stipulation this allegation was omitted from the amended complaint, which was not otherwise substantially changed except to make certain corrections in paragraph VI which need not be noted here.

On the other hand, if the contract of 1915 controlled, the

rights of the parties did not depend at all upon ownership of the subsurface under grants of the surface owners, but upon whether the vein where the trespass took place was part of a vein which apexed within the area bounded by Main Street, Auburn Street and the south townsite boundary, or without that area. Plaintiff has always considered the contract as operative and controlling. Whatever may have been plaintiff's reason for drawing the complaint as it did, it was agreed in the proceedings before trial that the rights of the parties depended on the 1915 contract, under which the issue determinative of ownership was the location of the apex of the disputed vein upon which the trespass took place. That issue, in turn, depended on whether the meeting of the Dromedary and Pennsylvania veins south of the drill holes was a junction or an intersection. We have heretofore referred to the remarks of defendants' counsel in his opening statement to the effect that the whole case depended on that point. If there is a junction, then those workings on the disputed vein outside the boundaries of lots 6 and 7, as well as such part of the workings as lay beneath those lots, are owned by plaintiff. We do not understand that defendants contend otherwise. Their contention was that there was an intersection, with the result that the workings on the disputed vein outside, as well as inside the lots' boundaries projected downward, were on the Dromedary vein. Since the water spread throughout these workings on the disputed vein below the 2400 level, the trespass was not confined to the workings lying beneath lots 6 and 7. It is quite clear, therefore, that it was proper for the court to make an adjudication of ownership co-extensive with the trespass, that is, to determine ownership of the disputed vein to the full extent that it had been followed by plaintiff's workings below the 2400 level, and this the findings and judgment did.

Properly interpreted, the findings and judgment also correctly determine plaintiff to be the owner of the vein and workings immediately above the 2400 level. It is alleged and found that the water trespass extended only up to the 2400 level drift. But the court found that a trespass was threatened to the workings above that level through extension of the defendant's 1800 level drift. Defendants concede that these workings just above the 2400 level are in part on vein material owned by plaintiff, since in defendants' analysis

the space of intersection lies there, which is plaintiff's under the contract of 1915. But as to part of the area, defendants contend that it lies upon Dromedary vein after an intersection with the Pennsylvania vein. Hence ownership depends on the issue of junction versus intersection, as does ownership below the 2400 level. It follows that the determination of ownership of the vein to the full extent that it had been followed by the 2400 level drift and workings just above that drift was within the issues of the case as developed on the trial.

Although defendants state that they object to an adjudication of ownership beyond lots 6 and 7, block 18, it is apparent that their real objection is not to an adjudication confined to the workings immediately below and above the 2400 level drift. Defendants concede that if these existing workings as they lie beneath lots 6 and 7, block 18, are on the Pennsylvania vein, they are also on that vein as they extend outside the lot lines. Their real objection is that the findings and judgment determine ownership far beyond those workings. In our opinion the findings and judgment should not be so interpreted.

The court found that "the Dromedary vein wherever it meets the Pennsylvania vein, as more fully described in the Findings of Fact hereof, forms a junction or union with said Pennsylvania vein, both in contemplation of the provisions of said contract of 1915 and as a matter of fact and law, and below said line of junction only one vein exists, namely, the Pennsylvania vein." Defendants contend that under this finding and the portion of the judgment based thereon, it has been determined that wherever the Dromedary, or other vein owned by defendant, and the Pennsylvania vein, or its branches, may meet, the plaintiff has been decreed to be the owner of all branches below the point of meeting. Defendants also object that the extent of the Pennsylvania vein is not clearly defined, and fear that future litigation may result.

These fears of defendants are not well founded. In addition to the finding above quoted, the trial court found that plaintiff is the owner of the Pennsylvania mine, containing the Pennsylvania vein, and that defendant is the owner of the Golden Center mine, containing the Dromedary vein; that the main Pennsylvania vein has its apex beyond and east of Auburn Street; that the underground workings are

entered through the main Pennsylvania shaft, three to four thousand feet southerly from the area in dispute, and that the Pennsylvania vein is followed continuously out each the 1700 and 2400 Pennsylvania levels, which levels penetrate beneath the surface of the Grass Valley Townsite and extend to the area here in dispute, which area is vertically beneath the surface of the townsite. The court also found that plaintiff owns all the mineral rights in the subsurface portion of lots 6 and 7 in block 18 of the Grass Valley Townsite below a depth of 200 feet from the surface, save any portion of the Dromedary vein as may exist above the junction of the Dromedary vein with the Pennsylvania vein, and also excepting any other veins, or portions of veins, not now disclosed which may be owned by defendant Cooley Butler by virtue of the 1915 agreement. It was also found that from all of the points where the Pennsylvania vein exists below lots 6 and 7 of block 18 it can be traced upward on its rise through workings continuously constructed at least to the 1000-foot level of the Pennsylvania mine, which level lies entirely to the east of Auburn Street; that the apex of the Pennsylvania vein is still further to the east of Auburn Street; that the vein on its downward dip from its apex includes all of the area of the vein lying vertically beneath lots 6 and 7 of block 18, and for a considerable distance both to the north and south of said lots. The court then identifies two branches of the Pennsylvania vein appearing in the middle raise of the Pennsylvania mine, and finds that both branches apex to the east of Auburn Street. These general findings, as well as those relating to the Golden Center mine and Dromedary vein, were necessary because of the provisions of the 1915 agreement, quoted in the findings, giving all veins and parts of veins that apex east of Auburn Street to plaintiff and those that apexed west of Auburn Street to defendant. These findings are all amply supported by the record. The trial court did not purport to define the exact extent of the Pennsylvania vein except in the area in dispute. It traced the vein sufficiently to demonstrate that its apex was east of Auburn Street. It did not, as defendants contend, adjudicate that all veins in the area were part of the Pennsylvania or were branches of that vein. If there are other controversies existing over the extent of the Pennsylvania vein other than in the area in dispute, the judgment in this case will not affect those controversies.

The main issue in controversy was the ownership of the vein disclosed by the workings north of the rake of encounter of the Dromedary and Pennsylvania veins. This rake of encounter was disclosed in the workings of plaintiff. But the workings did not disclose the entire rake of encounter of those two veins. The trial court was called upon to determine whether below the rake of the encounter the vein was Dromedary or Pennsylvania. To determine this it had to determine whether at any place along the rake of encounter there was an intersection. If such intersection in fact existed any place along the rake of encounter, an intersection, and not a junction, was proved. As already pointed out, the trial court found that along this rake of encounter there was a junction and not an intersection. In Finding XVI the trial court found in detail just where that rake of encounter existed and could be observed in the existing workings. No ambiguity exists as to that finding. The rake of encounter had not been entirely disclosed, but the trial court was entitled to infer that since there was a junction in the developed area, there was a junction in the undeveloped area. All that the trial court determined was that along the rake of encounter, as described in Finding XVI, there was a junction. It did not, and could not, find that if the Dromedary, or any other vein of defendant meets the Pennsylvania at any other place below the Grass Valley Townsite, such meeting was a junction. The general terms of the judgment must be interpreted in connection with the findings and conclusions upon which it is based. So interpreted, it simply decrees that the plaintiff owns the Pennsylvania vein from the area in dispute down dip and up dip. That portion of the judgment is predicated upon the findings and conclusions that along the rake of encounter in the area here in dispute there is a junction and not an intersection. The findings and judgment do not determine what occurs in any meeting of defendant's veins with the Pennsylvania in any other area.

The findings and judgment declare plaintiff to be the owner of the Pennsylvania mine and vein, without particularly locating either mine or vein, the effect of which, defendants contend, is to adjudge plaintiff to be the owner of any vein it may claim to be Pennsylvania. It is conceded, of course, that plaintiff owns a Pennsylvania mine and a Pennsylvania vein. But the purpose of this action was not to

locate the mine nor the vein in its entirety, nor to prejudge any disputes which may arise hereafter between the parties and which depend for their solution on other issues than whether the particular rake herein involved is an intersection or a junction. Should the existing workings of plaintiff be extended, and in their extensions depart from the Pennsylvania vein onto a vein of defendant, he would not be without remedy. Of course, in any future dispute the present decision would be res judicata as to the particular meeting of the two veins being a junction and as to the ownership of the vein to the extent that it had been followed by plaintiff's workings shown to exist on the trial.

*C. Error in judgment in including certain areas within plaintiff's ownership.*

In one respect, however, the findings and judgment are ambiguous and must be corrected. The findings, and consequently the judgment, omit any reference to the fact that the southern ends of the X, Y and Z drifts, the Prospect drift and a segment of the Powder Magazine cutoff are, by plaintiff's own admission, on the Dromedary vein. The findings and judgment declare these workings to be on plaintiff's vein. The necessary implication is that these workings are *entirely* on a vein owned by plaintiff, that is, on the Pennsylvania vein, although plaintiff concedes that in the exploratory process the drifts were run onto the Dromedary vein a short distance. The points at which the drifts passed from the disputed vein, found to be Pennsylvania, to the Dromedary vein are not disputed. The findings and judgment should be modified insofar as plaintiff is adjudged to be the owner of any part of the Dromedary vein and workings thereon.

*D. Other alleged errors in judgment.*

The court enjoined defendants from introducing water through the three drill holes "or any other drill holes similarly driven, or through any artificial conduits . . . from the Golden Center Mine so that it will escape through artificial means into the Pennsylvania Mine." This provision must be read in the light of the issues of the case, that is, as enjoining introduction of water into workings of plaintiff existing at the time of trial lying immediately above and below the 2400 level drift and north of the rake herein involved, including also the stoping which extends up dip 80 feet south of that rake.

Defendant contends that the court erred in overruling the demurrer and motion to strike for the reason that the complaint was uncertain in that it could not be ascertained whether the action concerned "the entire so-called Pennsylvania vein," or only the vein and workings within lots 6 and 7. �In Defendant urges that the court erred in denying his motion for new trial made on the ground that the judgment went beyond the issues of the case in that it related to the entire vein and mine. Since we have held that the judgment did not have such effect, this ground of motion is without merit. ▀ The judgment will not be reversed because of uncertainty in the complaint which was ground for special demurrer where, as here, the issues were agreed upon when the trial commenced and the defendant has not been prejudiced by the uncertainty.

*E. Propriety of injunctive relief as to future water trespasses.*

Defendants contend that on the facts found plaintiff was not entitled to injunctive relief.

In the first cause of action plaintiff complains of the introduction of water into its workings through the three drill holes made by defendants. In the second cause of action it complains of the winze, which, it alleges, will if continued break into plaintiff's workings on and near the 2400 level. Responsive to the first cause of action, the decree herein, in addition to awarding plaintiff damages, enjoined defendants "from introducing or causing to flow through said drill holes, or any other drill holes similarly driven, or through any artificial conduits, any water from the Golden Center Mine so that it will escape into the Pennsylvania Mine." (Cl. Tr., p. 87.)

The complaint alleged that unless the deliveries of water into the drill holes ceased, great and irreparable damage would result even though the holes were temporarily plugged by plaintiff because the water would spread through the adjacent crevices and interstices in the rock and soften it and cause the rock in the roof of the No. 4 winze and stopes to cave, with great danger to the lives and physical well-being of plaintiff's employees engaged in working there and to the safety of said stopes and winze. The complaint further alleged that the construction of the drill holes and the induction of the water by artificial methods from defendants'

mine constituted a deliberate, willful and malicious trespass by defendants upon plaintiff's property, for which plaintiff had no plain, speedy or adequate remedy at law, and unless prevented by order of the court the trespass would cause plaintiff great, continuing and irreparable damage. (Cl. Tr., p. 8.)

We have heretofore referred to the court's findings as to defendants' drilling the first of the three holes in 1936 on the 1100 level, laying pipes along that level after they realized they had encountered an opening, and by means of a pump artificially forcing the water through these pipes into a dammed-up area surrounding the top of the drill hole and thence down the hole into plaintiff's workings on the disputed vein, which the court held to be Pennsylvania and the property of plaintiff. The defendants continued to deliver the water artificially into plaintiff's workings through this hole until January, 1940, the court found, when plaintiff plugged it up. In January, 1939, according to the findings, they replaced the original pump by a second one. When plaintiff plugged the first drill hole immediately following its discovery in December, 1939, the defendants artificially introduced mine drainage water through a second hole, drilled in 1939. When that was plugged, they sent water down a third hole. The court found: "The defendants' agents and employees knew, or reasonably should have known, that the drill holes drilled by defendant had penetrated lower levels of plaintiff's mine. The water of the Golden Center Mine thereafter wrongfully, wilfully and intentionally diverted by defendant by artificial means down through these holes and into plaintiff's mine caused plaintiff injury and put plaintiff to the expense of pumping and removing from plaintiff's mine this water originating in defendants' mine. The court finds the reasonable amount of these damages to be that indicated in the computation made by representatives of both parties, namely the sum of $2,531.34." (Finding XXI. Cl. Tr., p. 76.)

The court did not expressly find in the terms of paragraph X of the complaint that great and irreparable damage would result, even though plaintiff plugged the holes, due to the softening of rock in the roofs of plaintiff's winze and stopes, but it impliedly so held by Finding XXV as follows: "Each and all of the allegations of plaintiff's Amended Complaint not inconsistent with the foregoing findings are hereby

found to be true and correct statements of fact." (Cl. Tr., p. 78.)

The defendants do not contend that the findings as to the drilling of the holes and the introduction of water into plaintiff's workings through them are unsupported by the plaintiff's evidence. They point to testimony of Cooley Butler to the effect that the holes were driven for exploratory purposes, that he was ignorant of the fact that plaintiff had workings on the disputed vein, and that he believed the opening which the drill holes penetrated was a natural one. This evidence merely created a conflict. In the state of the record, the question of what defendants knew and should have known in this connection was for the trial court, which resolved this conflict in plaintiff's favor.

Although defendants stated in their opening brief (Op. Br., p. 4) that they "agreed that an injunction might issue against pouring further water into the drill holes" (see, also, Op. Br., p. 318), they now contend, in their supplemental briefs, that, insofar as the complaint seeks to enjoin future water trespasses, it should be dismissed with prejudice for the reason that there is no showing that future water trespasses were apt to recur or that such trespasses were continuous, or were irreparable, or serious, or not compensable in money. The water trespass had been going on for a considerable period when plaintiff discovered it late in 1939. The court found upon plaintiff's evidence that defendants' agents and employees knew or reasonably should have known that the drill holes had penetrated lower levels of plaintiff's mine, and that when plaintiff plugged up the first hole, defendants artificially introduced the water through a second hole, and when that was plugged they sent it down a third hole. The plaintiff obtained an injunction *pendente lite* restraining defendants from introducing water by artificial means into plaintiff's workings. Under such circumstances, the trial court did not exceed its powers in enjoining future trespasses.

It is well settled that an injunction may be granted against repeated or continuous trespasses. The property owner will not be relegated to successive suits for damages. (*Slater* v. *Pacific Amer. Oil Co.*, 212 Cal. 648, 655 [300 P. 31]; *Watson* v. *Heger*, 48 Cal.App.2d 417 [120 P.2d 153]; *Eames* v. *Philpot*, 72 Cal.App. 151 [236 P. 373]; 28 Am.Jur. 318-330; notes, 32 A.L.R. 463; 92 A.L.R. 578, injunction

against repeated or continuous trespasses on real property.) ▓▓▓ It is not a ground for denying an injunction that the defendants ceased to deliver water into plaintiff's mine while the temporary injunction has continued in effect. (*Vaughan* v. *John C. Winston Co.*, 83 F.2d 370, 373, 374; *Goshen Manufacturing Co.* v. *Hubert A. Myers Manufacturing Co.*, 242 U.S. 202, 207, 208 [37 S.Ct. 105, 61 L.Ed. 248]; *Walling* v. *Haile Gold Mines, Inc.*, 136 F.2d 102, 105.) ▓▓▓ Moreover, litigants are entitled to reasonable repose from future unnecessary litigation. The plain and direct manner of giving this repose is by enjoining the defeated party from continuing to perform the acts found to be wrongful. If he has no intent to continue the wrongful acts he is not injured by the decree. If he has such intent the injunction protects the successful party from the necessity of bringing successive actions for damages. Thus, in quiet title suits, in the discretion of the court, the decree frequently includes an injunctive provision. (*Wolf* v. *Gall*, 174 Cal. 140 [162 P. 115]; *Brooks* v. *Calderwood*, 34 Cal. 563; *Taylor* v. *Hawley*, 6 Cal.App.2d 576 [45 P.2d 226]; see discussion and cases collected 22 Cal.Jur., p. 133, § 20.)

For these reasons it is apparent that the portion of the decree enjoining future water trespasses was proper.

*F. Propriety of that portion of the decree enjoining defendants from breaking into the workings of plaintiff.*

The provisions of the decree based upon the second cause of action have been described above. Defendants are enjoined "from continuing to sink defendants' 'enjoined winze,' . . . or continuing or extending any other workings in the vicinity of said winze and particularly the levels extending therefrom so that said winze or workings shall break into or penetrate or materially injure any of the workings of plaintiff's Pennsylvania mine." (Cl. Tr., p. 88.) The effect of the decree is to require defendant in the course of mining operations upon his own vein to leave a barrier between his workings on the Dromedary vein and the earlier workings of plaintiff's Pennsylvania mine, with provision for appraisal of the ore in the "protective pillar of rock" which defendant is required to leave, and payment of the value thereof by plaintiff to defendant. The portions of the decree which provide for such appraisal and payment are set forth in the early pages of this opinion.

It appears from the plaintiff's own model (Ex. 5) that the enjoined winze if continued will break into that portion of plaintiff's X drift which plaintiff's predecessor had carried beyond the junction of the Dromedary and Pennsylvania veins, and which is admittedly upon defendant's own Dromedary vein south of the junction. The defendant's 1800 level drift if continued will break into that part of the plaintiff's Prospect drift, which is on defendant's Dromedary vein. Hence the effect of the decree is to enjoin defendants from breaking into workings of plaintiff which are on defendant's vein. Insofar as the decree enjoins defendants from continuing the enjoined winze or the 1800 level drift to the point of break through, plaintiff in a supplemental brief filed at the request of the court virtually concedes that it is improper. The court requested the parties to file briefs on the following questions:

"1. As a condition of securing equitable relief should the plaintiff be required to seal up the southerly portions of the Prospect X, Y and Z drifts of its mine at the rake of encounter of the Dromedary and Pennsylvania veins, and be required to seal up the Powder Magazine Crosscut where it cuts into the Dromedary vein, so that defendants will not be prohibited from mining a portion of their Dromedary vein?

"2. If such condition should be imposed, should such condition be imposed by this court or should the case be returned to the trial court for that purpose?

"In addition to these points, the court desires counsel to furnish it with any further comments and authorities that may be available on the propriety of the exact form of the injunctive relief granted in this case."

Plaintiff has filed a brief in which it consents and offers to stipulate to a decree imposing upon it an obligation to seal off these drifts to the extent that its predecessor had inadvertently run them onto the Dromedary vein. Plaintiff's consent is to seal off these ends in the event operations should be resumed in the mines, which are now shut down. Plaintiff makes this offer to enable defendant to mine its Dromedary vein in these drifts. Defendants in their supplemental brief, however, reject the tendered stipulation and reply that it is a "matter of indifference" to them whether plaintiff constructs such barriers. For this reason the decision of this court makes no provision therefor. But the consent and ten-

dered stipulation are referred to here for the reason that plaintiff thereby concedes the right of defendants to break into the ends of these workings of plaintiff which extend onto the Dromedary vein.

This concession of plaintiff does not entirely dispose of the problems raised by the portion of the decree requiring defendants to leave a protective pillar of rock between their workings and those of plaintiff. This is so because the decree forbids defendants from continuing any of their workings to the point of break through. Obviously, workings of defendants now in existence or hereafter constructed if continued to the junction of the Dromedary and Pennsylvania veins might break into plaintiff's workings on the plaintiff's Pennsylvania vein. It is, therefore, necessary to consider the propriety of the provision of the injunction which provides for the barrier.

Plaintiff cites no precedent for a decree adjusting in this fashion the rights of owners of two veins which join to form a single vein. As grounds for equitable relief in the form of a decree requiring defendant to leave a natural barrier between his workings and plaintiff's, plaintiff alleges as to the enjoined winze: "Said winze is being driven without any notice to or permission or authority from the plaintiff, and if and when, by blasting, defendants cause said winze to break into plaintiff's workings, there is grave danger that serious injury will be caused plaintiff's employees engaged in work therein; that the roof and supporting timbers in said workings will thereupon be damaged and injured; and that additional floods of water, artificially induced thereupon will be permitted to flow into plaintiff's mine through said workings." (Cl. Tr., p. 23.)

Thus plaintiff fears: (1) Injury to its workmen due to blasting; (2) injury to the roof and supporting timbers of its workings near the threatened break through from blasting; (3) additional floods of water artificially induced in plaintiff's workings by reason of the plaintiff's workings and those of defendant opening into each other.

The court's findings omit as an element of the injury to be feared "additional floods of water artificially induced," and add as a reason for the decree a "distinct danger" of "possible highgrading" in the Pennsylvania mine. The court's full finding as to the necessity for equitable relief in the form awarded is as follows: "The essential operations of drilling

and blasting and removing the supporting rock in the vicinity by defendants will jeopardize and cause injury to said Pennsylvania mine workings and will endanger the lives and safety of men therein and create a distinct hazard. Breaking into said workings will afford access to said Pennsylvania mine, which access will not be under the control of the Pennsylvania mine management. High grade ore is at times encountered in said Pennsylvania mine operations and the entry of persons into said mine not under the control of the Pennsylvania mine management would be a distinct danger and give an opportunity for possible 'highgrading' in the Pennsylvania mine. All of this threatened injury to plaintiff's mine, as aforesaid, if consummated, is serious, wrongful, wilful and irreparable and of a character not readily measured in money damages, whereas any possible injury to defendant, Cooley Butler, is not irreparable but can be readily measured in money damages.'' (Cl. Tr., p. 77.)

Defendants' brief contains the following statement: ''The defendant is willing, and has so expressed himself on trial, to be enjoined from causing water to flow into the plaintiff's mine by artificial means other than the ordinary and prudent working of the defendant's own veins. The defendant is willing, and has so expressed himself on trial, that if in the prosecution of his own work on his own veins he shall be approaching any workings of the plaintiff on plaintiff's veins of which he shall have notice, he, the defendant, will accede to any reasonable arrangement that the court may order that will permit the pursuit of his own vein and remove all possibility of danger to persons or property in plaintiff's own workings, and will so conduct his operations at such times and in such manner that no danger will be entailed, details to be decided by the court.'' (Op. Br., p. 318.)

Plaintiff relies on cases which affirm the right of lateral and subjacent support as affording authority by analogy for the decree herein. At common law a landowner as a general rule is entitled to have his soil remain in its natural position, without being caused to fall away by reason of excavations or other improvements on neighboring land. (3 Tiffany, Real Property (3d ed.) p. 186, § 752.) The right is to support of the land in its *natural* state, without the added weight of a building upon it. (3 Tiffany, Real Property (3d ed.) p. 190, § 753.) Similarly, where

534

one person owns the surface of land and another the subjacent land, or the minerals therein, the owner of the surface is entitled to have it remain in its natural condition, without any subsidence by reason of the withdrawal of the land or minerals thereunder by the subjacent owners. (3 Tiffany, *supra,* p. 196, § 754.) ▆▆ Violation of the rights of lateral and subjacent support gave rise to an action for damages which was ordinarily held not to accrue until a subsidence had taken place, although occasionally a right to an injunction against further excavations was recognized after some damage had resulted. (3 Tiffany, *supra,* p. 187, § 752; Costigan, Mining Law, p. 508, note 46.)

▆▆ The right to lateral and subjacent support is a right pertaining generally to land ownership. It does not depend on the facts of the particular case. Where such right exists it is in the nature of an easement. It is not required that the servient owner be compensated in money for the inconvenience and restriction in use which the duty to maintain lateral and subjacent support entails.

▆▆ In the case herein plaintiff fears that the blasting and drilling incident to defendant's mining his own vein to its junction with plaintiff's Pennsylvania vein will cause injury to the roof and supporting timbers of plaintiff's workings in the vicinity of the junction. Where a mine owner extends his own workings by blasting and drilling it would seem that there usually will be some injury to the adjacent area. It is not found in the case herein that the damage to plaintiff's workings which will result from defendant's extending his workings to the junction, will be any greater than the damage which occurred to the vicinity when plaintiff extended its own workings along its vein. Plaintiff cites no authority for the proposition that a mine owner who first mines to a junction has a right, either in law or equity, to require the owner of the other vein to refrain from mining his vein to the junction in order that a natural barrier may remain, lest the workings of the owner first to mine suffer only such damage as is incident to careful operations by the owner last to mine.

The doctrines of lateral and subjacent support were anciently established. But there is no body of law declaring that the owner of minerals must refrain from mining to his mineral boundary, whether that boundary is a fixed line

projected beneath the surface or at a junction of veins where there is a right to follow a vein extralaterally, in order that there may be no injury whatsoever to earlier mine workings. On the contrary such statements as are found in the cases cited herein are to the effect that a mine owner may follow his vein to the limit of his ownership. In *Executors of Lord* v. *Carbon Iron Manuf'g. Co.*, 42 N.J.Eq. 157 [6 A. 812, 825], the court quoted from the English case of *Baird* v. *Williamson*, 15 C.B. (N.S.) 376, as follows: "The general rule of law is that the owner of one piece of land has a right to use it in the natural course of user, unless in doing so he interferes with some right created either by law or contract; and, as a branch of that law, the owner of mineral land has a right to take away the whole of the minerals [iron ore] in his land, for such is the natural course of the user of mineral land; and that a servitude to prevent such a user must be founded on something more than neighborhood."

In *Jones* v. *Robertson*, 116 Ill. 543 [6 N.E. 890, 894, 56 Am.Rep. 786], the court said: "We understand that each owner of mines thus situated has the right to take out *all the coal* within the limits of his own boundaries; that is, each may work to the dividing line in every direction, but, of course, cannot cross it without becoming a trespasser."

The court's statement in *National Copper Co.* v. *Minnesota Min. Co.*, 57 Mich. 83 [23 N.W. 781, 786, 58 Am.Rep. 333], is as follows: "The mere fact that an opening was made by the defendant between the two mines, would not of itself have been a trespass unless the defendant invaded the plaintiff's premises in making it. Each party had a right to mine on its own side to the boundary."

The following statement is made in *Duff* v. *United States Gypsum Co.*, 189 F. 234, 235: ". . . it had the right, under the authorities, to which the court has been referred, in England and in this country, to mine all of its property profitable to be mined, provided it operated in a reasonable and natural way, no matter what the consequences might be to its neighbor."

The wording of section 2336, Revised Statutes, is also significant. When two veins intersect the prior location is "entitled to all ore or mineral contained within the space of intersection," but the subsequent locator has a right of way through the space of intersection. Where two or more veins

536

unite the prior location takes the vein *below* the point of union. The implication is, of course, that the subsequent locator takes his vein *to* the point of union. The language of the section excludes the idea that a property right shall exist generally in a prior locator to require the subsequent locator whose workings are later to stop short of the line of union, or, in case of an intersection, to leave a natural barrier on each side of the space of intersection.

For these reasons, and upon the authorities above cited we conclude that there is no general right in a mine owner who has first opened up his mine to the limits of his boundary to require the adjoining owner to leave a natural barrier by stopping short of the common boundary. But plaintiff contends that in the particular circumstances of this case an equitable decree in the form herein rendered is proper.

Based on the premise that no such general right exists, defendants contend that the effect of the portion of the decree now under discussion is to give to plaintiff, a private corporation, the right of eminent domain, contrary to the Constitution and statutes, which permit private property to be taken only for a public use. In plaintiff's view there is here nothing more than an equitable adjustment of the rights of the parties, dictated by the circumstances of the particular case, which by reason of the fact that it resolves problems between adjoining mine owners does not involve an exercise of eminent domain.

Without now determining whether a situation might arise where a decree in the form herein would be lawful, we are of the view that upon the facts alleged and found in this case there is no showing of special injury which justifies such unusual equitable relief. If plaintiff upon the facts alleged and found here is entitled to an equitable decree requiring defendant to leave a natural barrier, our decision will constitute a precedent for granting such a decree in practically all cases where later workings, if continued, will break into earlier workings of another mine owner, since plaintiff alleges no threatened injury which would not be present in all, or in most, cases. Furthermore, it would seem that as to all injuries feared except some damage to plaintiff's workings, adequate protection may be had without the necessity of an equitable decree for a natural barrier. Plaintiff fears injury to its workmen from defendant's blasting. It is not

to be anticipated that defendant will blast without warning plaintiff so that its workmen may leave the danger zone. Furthermore, the decree of the trial court provides for an exchange of maps whenever a close approach of the workings of the two mines is indicated by sounds of blasting or other operations, and that defendants should "advise plaintiff of the time of defendants' blasting in order that plaintiff's employees in that vicinity may be duly warned." This portion of the decree is not seriously challenged by defendants and should be affirmed.

Plaintiff fears highgrading. It can protect itself by constructing a barrier near the place of break through to prevent the entry of persons through defendant's workings. Defendant is also interested in preventing the entry of highgraders into his mine. It is not to be expected that he will fail to take steps to secure his own workings against wrongful entry by persons who might pass from plaintiff's workings into defendant's.

 It has been noted heretofore that the court did not list the danger of additional floods of water artificially introduced as a reason for the injunctive decree, although listed by plaintiff in its complaint. By other provisions of the decree, heretofore discussed, future water trespasses were enjoined. Doubtless the court was of the view that its mandate to defendant constituted a sufficient protection to plaintiff without necessity for a natural barrier to prevent entry of such water. For water which flows into a lower mine naturally as a result of operations conducted in a careful manner, the lower owner cannot complain. (Costigan on Mining Law, p. 534, § 158; 3 Lindley on Mines (3d ed.), p. 1985, § 807; *Executors of Lord* v. *Carbon Iron Manuf'g. Co.,* [42 N.J.Eq. 157, 6 A. 812, 824]; *Spadra Creek Coal Co.* v. *Eureka Anthracite Coal Co.,* 104 Ark. 359 [148 S.W. 644, 646, Ann.Cas. 1914C 454]; 55 A.L.R. 1470.) The decree in its references to "artificial conduits" and "artificial means" recognizes this and plaintiff concedes in its brief that it is the law. For such water as may reach plaintiff's mine as a natural result of defendant's mining operations conducted in a prudent manner, as well as for any injury which may inevitably result to plaintiff's workings from defendant following his vein to the junction in a careful manner, plaintiff cannot complain. Its loss, if any, will be *damnum absque injuria.* The decree of the court below retains con-

tinuing jurisdiction for purposes relating to the enforcement of the decree. Under this provision the court may enforce the obligation of defendants to mine in a careful manner. Defendants do not dispute their obligation in this respect.

*G. Defendants' contention that the case is moot because of facts occurring since the trial.*

As already pointed out, the court directed the parties in their supplemental briefs to consider further the propriety of the exact form of injunctive relief granted by the trial court. In those briefs it was brought out by statements in which both sides concur, and also by affidavit of Wallace Butler, that, after the entry of the decree herein, mining operations on defendant's property ceased about March, 1942, and that the mine has been allowed to fill with water. The affidavit states that this suspension was made necessary by government restriction, by inability to obtain labor and materials and by general economic conditions. On October 7, 1942, the War Production Board by its order L-208 directed the closing of all gold mines. According to the affidavit, prior to suspension of operations, the collars of the three drill holes were filled with cement, and all underground equipment in defendant's mine was removed, including ore cars, rails, track, pipe and pumps. The mill equipment has been partially dismantled and large amounts of other surface equipment has been removed.

Defendants now argue that the plaintiff has no need of injunctive relief while this situation continues. It is pointed out that it is physically impossible for defendant to operate its mine while filled with water and legally impossible while the government's closure order is in force. Therefore, defendants argue, the case has become moot insofar as plaintiff seeks injunctive relief. In their analysis the injunctive provisions of the judgment should be reversed with directions to the court below to dismiss the action without prejudice insofar as it seeks an injunction against defendants breaking into plaintiff's workings. The fact that, in the future, production of gold may become legal and profitable is not, in defendants' view, sufficient to support entry of an equitable decree now. The defendants' contention that, insofar as the action seeks an injunction against future water trespasses, it should be dismissed with prejudice, has been considered above.

Based on the premise that the injunctive provisions of the decree are now moot, defendants further contend that the adjudication of ownership is an incident of the injunctive decree, and that such adjudication of ownership must fall with the equitable provisions of the decree. The defendants attach a proposed form of judgment to their supplemental brief in which it is merely adjudged that plaintiff recover $2,531.34. They also propose amended findings and conclusions of law in which it is found that defendants introduced water into plaintiff's workings on plaintiff's Pennsylvania vein, which was removed by pumping at a cost of $2,531.34, and that plaintiff's and defendant's mines are shut down in compliance with federal order, and defendant's workings are filled with water. In these proposed findings the defendants evidently use the phrase ''plaintiff's workings on the Pennsylvania vein'' as referring to the workings on the vein which defendants admit is Pennsylvania. The suggested findings do not determine the ownership of the disputed vein, nor the question of junction versus intersection on which that ownership depends.

We have heretofore said that since the drill holes emptied into plaintiff's workings on the disputed vein, and the water was pumped from plaintiff's workings on that vein, the ownership of the vein was relevant to the action for damages, as well as to the injunction, notwithstanding the water reached beyond the disputed vein into workings which defendants concede are on plaintiff's Pennsylvania vein. Furthermore, apart from the cause of action for damages, the fact that the plaintiff does not immediately need injunctive relief in the form awarded by the decree, by reason of the closing of the mines, does not render moot the question of ownership of the disputed vein, to which both parties claim title. Should we refuse to consider the propriety of the injunctive decree in the form rendered by reason of the fact that plaintiff has no need for it while the mines are shut down, we would, nevertheless, determine the propriety of the trial court's adjudication of ownership of the disputed vein in favor of plaintiff. It is true that the ownership of that vein was incidental to the right to injunction in the sense that unless plaintiff owned the vein it was not in any event entitled to the injunction against defendants' breaking through. But plaintiff desires an adjudication of ownership

even though we should hold, which we do not, that we will not consider the propriety of the injunctive provisions. The trial court has decided the issue of ownership in plaintiff's favor. The trial was devoted largely to that issue. The reporter's transcript contains more than two thousand pages, indicating an exhaustive inquiry. The adjudication of ownership in favor of plaintiff is not to be cast aside because facts arising pending appeal remove the immediate need for injunctive relief. Plaintiff is not to be deprived of that adjudication by reason of facts occurring after judgment because he brought his action in the form of a suit for injunction, rather than a quiet title suit.

In the case herein we have not refrained from passing on the propriety of the injunction, but we have held, in favor of defendant, that the injunction is improper insofar as it requires plaintiff to leave a barrier. The plaintiff is not urging that this question be left undecided. We have held above that the injunction is proper insofar as it restrains future water trespasses.

In *Walling* v. *Haile Gold Mines, Inc.*, 136 F.2d 102, the administrator of the Wage and Hour Division, United States Department of Labor, sought an injunction to restrain a company engaged in gold mining from violating the Fair Labor Standards Act. The district court denied the injunction. The company moved to dismiss the administrator's appeal on the ground that "the question presented by this appeal is now a moot question for the reason that the appellee is no longer engaged in the mining and reduction of gold-bearing ore, has dismantled its former gold mine and removed its machinery to the State of Alabama, where it is engaged in mining graphite, in which it is in full compliance with the Fair Labor Standards Act, and its license is expired." (136 F.2d 102, 105.) There, as here, the War Production Board's order prevented reopening of the mine. In refusing to leave undecided the question of the administrator's right to an injunction, the court said: "It is familiar law that the discontinuation of an illegal practice by a defendant (either by going out of business or otherwise) after the institution of legal proceedings against the defendant by a public agency, does not render the controversy moot. [Citing cases.] This is particularly true where the challenged practices are capable of repetition. . . . Nor is a case rendered moot where there is a need for the determination of a question of law

to serve as a guide to the public agency which may be called upon to act again in the same matter." (136 F.2d 102, 105.)

But that the court did not place its decision solely on the ground that a public agency was involved is indicated by the following: "Haile [the gold mining company] is still a going concern and it still owns the gold mines and the equipment to operate them. The admitted likelihood of Haile's resuming operations as soon as the ban on gold mining has been lifted clearly indicates that a genuine and substantial controversy exists between the parties. The possibility of future violations of the Act by Haile is very much with us and not merely within the realm of prophecy. Moreover, an adjudication on the merits by us at this time will finally resolve the instant dispute and obviate the need for, and the expense of, repetitious litigation in the future if, as and when Haile resumes mining operations." (136 F.2d 102, 105.) The court said of *United States* v. *Hamburg Amerikanische Packet-Fahrt-Actien Gesellschaft,* 239 U.S. 466 [36 S.Ct. 212, 60 L.Ed. 387], one of the cases relied upon by defendants herein, that it was distinguishable. As applied to the present case the same may be said of other cases cited by defendants herein, including *United States* v. *Alaska S. S. Co.,* 253 U.S. 113 [40 S.Ct. 448, 64 L.Ed. 808]; *Commercial Cable Co.* v. *Burleson,* 250 U.S. 360 [39 S.Ct. 512, 63 L.Ed. 1030]; *Berry* v. *Davis,* 242 U.S. 468 [37 S.Ct. 208, 61 L.Ed. 441]. In the case herein we have held that plaintiff is in any event entitled to a decision on the question of ownership of the disputed vein. In our view it is proper at this time to dispose of the whole case, rather than to leave to subsequent litigation the decision as to the propriety of the injunction concerning which the briefs contain extensive argument.

*Conclusion.*

From what has been said we conclude that the judgment should be affirmed as to the award of damages. We also conclude that the trial court correctly determined that the Dromedary and Pennsylvania veins form a junction and not an intersection in the area in dispute, and that the adjudication that plaintiff owns the vein north of the rake of encounter of the Dromedary and Pennsylvania vein should be affirmed. However, insofar as the findings and judgment imply that the plaintiff owns the southern tips of the X, Y and Z drifts,

the Prospect drift and a segment of the Powder Magazine cutoff, as depicted in green on plaintiff's model, Exhibit 5, the judgment should be reversed and the trial court instructed to modify its findings and judgment so as to declare the defendant Cooley Butler is the owner of these segments as shown on said exhibit. We also conclude that the judgment should be affirmed insofar as it enjoins future water trespasses by defendants, and insofar as it requires defendants to give warnings to plaintiff and to exchange maps with plaintiff as their workings approach those of plaintiff, and insofar as the trial court retains jurisdiction to enforce this and other portions of the decree. We conclude that insofar as the decree enjoins defendants from continuing the enjoined winze or their 1800 level drift, or continuing or extending any of their other workings to the point of break through with plaintiff's workings, and insofar as the decree requires defendants to leave a protective pillar of rock between their workings and those of plaintiff, it should be reversed. In all other respects not specifically enumerated the judgment should be affirmed. It is so ordered. Appellants and respondent to bear their own costs on this appeal.

Knight, J., and Ward, J., concurred.

A petition for a rehearing was denied February 25, 1944, and appellants' petition for a hearing by the Supreme Court was denied March 23, 1944.